[Civ. No. 114. Third Appellate District.—September 10, 1908.]

**P. R. PAOLINI, Appellant, v. FRESNO CANAL AND IRRIGATION COMPANY, a Corporation, Respondent.**

NONSUIT—RULES FOR JUDGING CORRECTNESS OF ORDER.—In judging the correctness of an order granting a motion for nonsuit, the evidence for the plaintiff is deemed to be uncontradicted, and every fact and every reasonable inference that may be drawn from any fact must be regarded as proven, and if such proof would support a verdict for plaintiff, it is error to grant a nonsuit; and it is only when the facts are such that a verdict for the plaintiff would compel the court to set it aside that a nonsuit is properly granted.

ID.—ERROR IN DIRECTING VERDICT—NEGLIGENCE IN PERMITTING SEEPAGE FROM DITCH—OBSTRUCTIONS TO FLOW—INJURY TO VINEYARD.— In an action for damages to plaintiff's land from negligence of the owner of an irrigating ditch, in permitting unnecessary seepage therefrom, owing to standing water therein, the flow of which was obstructed by growing grass and tules and other obstructions allowed to accumulate therein, when it appears from the facts proved by plaintiff that such seepage destroyed five acres of vineyard growing on plaintiff's land, the evidence is sufficient, *prima facie*, to show liability of the defendant for the resulting damages; and it was error for the court to refuse to submit the evidence for plaintiff to the jury, and to direct a verdict for the defendant at the conclusion of such evidence.

ID.—INJURY FROM SEEPAGE AND PERCOLATION—DAMAGES—MAXIMS.— There is no rule of law that injury to land from seepage and percolation is under all circumstances *damnum absque injuria*. There may be as direct damage by this means as by overflowing the

banks of a ditch, and the law will as readily redress an injury resulting from the one cause as from the other, when the facts satisfactorily locate the cause. In such case the maxim applies, *"Sic utere tuo ut alienum non laedas."*

ID.—CIRCUMSTANTIAL EVIDENCE OF CAUSE AND EFFECT.—Although there was no direct evidence establishing with absolute certainty cause and effect, there were enough facts and circumstances tending to establish it to take from the court the right to direct a verdict.

APPEAL from a judgment of the Superior Court of Fresno County rendered upon an order directing a verdict for the defendant. Geo. E. Church, Judge.

The facts are stated in the opinion of the court.

Henry Brickley, for Appellant.

Frank H. Short, and F. E. Cook, for Respondent.

CHIPMAN, P. J.—Action for damages. The jury, under instruction of the court and upon motion of defendant, at the conclusion of plaintiff's evidence, rendered a verdict for defendant. Plaintiff appeals from the judgment upon the verdict.

Plaintiff alleged ownership of certain one hundred and sixty acres of land, along the eastern boundary of which defendant was the owner of an irrigating ditch used for the purpose of storing and conveying water; that defendant had failed and neglected to keep said ditch in repair, by reason of which said failure and neglect "the same has become unfit for the purpose of carrying or containing water, and for a long time has been so unfit, and water allowed to flow therein has for a long time constantly seeped or percolated through the banks and bottom thereof and flooded lands adjacent thereto," and "well knowing the defective condition of said ditch, defendant has carelessly and negligently, and against the will of plaintiff, caused water to flow in and through said ditch, or in or through said ditch, which said water has constantly seeped or percolated through the banks or bottom thereof during said time, and has constantly flooded a large tract of vineyard, to wit: seven or eight acres belonging to plaintiff, lying adjacent to said ditch, and being part of the real property described in paragraph II of the complaint"; that by

reason of said flooding said land has become valueless and has been converted into a swamp, whereby plaintiff has suffered the damage complained of.

In its answer defendant denies specifically the allegations of the complaint and sets up a special and separate defense, but as this latter phase of the case was not reached, this defense need not be stated.

The rules in judging the correctness of orders granting motions for nonsuit are well settled. The evidence submitted by the plaintiff is deemed to be uncontradicted, and every fact and every reasonable inference that may be drawn from any fact must be regarded as proven. If the facts proven directly or the just inferences from facts proven would support a verdict for plaintiff, the nonsuit should not be granted, and it is error to do so. It is only where the facts are such that a verdict for plaintiff would compel the court to set it aside that a nonsuit is properly granted. (*Morey* v. *Wells,* 147 Cal. 495, [82 Pac. 57] ; *Vanderford* v. *Foster,* 65 Cal. 49, [2 Pac. 736].) We must consider the evidence with the above rules in view and be governed by them.

It appears by plaintiff's testimony that he is the owner of one hundred and sixty acres of land, most of which is planted to vines. One of defendant's ditches comes to his land from the north to his northeast corner and is used for irrigating purposes, and runs along the eastern boundary of plaintiff's land, from the northeast corner to the southeast corner (which we will designate as the north ditch), where it joins another of defendant's ditches coming from the east, this latter ditch at that point continuing southward and is spoken of by witnesses as the south ditch. At the northeast corner of plaintiff's land is a gate in defendant's ditch through which water is let into another ditch spoken of as a "side ditch," which runs along plaintiff's northern line. The portion of plaintiff's land alleged to have been rendered worthless through defendant's negligence is about five acres, and is situated about midway between the northeast and southeast corners, and lies immediately along the defendant's said north ditch between these two points. This piece of land is somewhat lower than the surrounding lands of plaintiff, and is spoken of by the witnesses as a "low place" or "sag" in plaintiff's land. Plaintiff testified that he "bought this land about five or six years ago," and had rented it two years before that.

(The trial was February 16, 1905.)    These ditches were all
there when he bought the land.   He testified that when water
is run through the south ditch it backs up in this north ditch
to a point above this low place of plaintiff's land and stands.
He testified: ''During the summer months there is water in
that ditch (the north ditch) all the time; during spring
and summer.   There is water there now.   It is coming from
here (indicating from south to north) this way, and this water
is coming down and backing up here.   There was water in
that ditch all last year during the spring and summer.   And
the year before that, and every year before that.   Here (in-
dicating a portion of his land) is a kind of low place like
that; here the land is all high (speaking from a diagram,
apparently).   Where it is low the vines have died.   The
condition of the land in that low place you might say is worth-
less on account of the seepage water.   In reference to its being
dry or wet, it is wet. . . .   Well, it happened that the vines
all died in the last two years.   In the low place is a part of
the vineyard that had been producing vines before.   The
vines have all died out in the low place.   They have all died
on the low place.   The land surrounding the low place and
those vines around the edges on the high place I noticed last
summer that they didn't bear as good as they did before.
. . . About three years ago there was a pretty good crop of
raisins on this low place where there are no vines, I should
judge fully an acre around like that.   That would make five
acres.''   He testified that the land immediately around ''this
low place produced about a ton per acre of raisins or dried
cured grapes. . . . This particular piece during the year
1903 didn't produce hardly any, maybe fifteen or twenty
pounds on some of the sickly vines, one bunch here and there;
last year it produced none at all.''   He also testified that
the water that stood in the north ditch came from the south
ditch by backing up; that there was no water run through
the north ditch the year before except for two days; that
if water was run through that ditch it would go on into the
south ditch, ''but there would be some water remain there.
There would be a low place in the ditch where the water would
have to evaporate.   If there was no water in the big ditch
south the water would go from the north through this ditch
and on the south pretty well, but not all of it.   It would

leave some water on the low place there, but not so high as if there was water in the south ditch."

Witness McKay, county surveyor, made a survey to ascertain the relative levels of the low place on the north ditch and the water in the ditch at the point of the alleged seepage and the level of the land affected thereby. He testified: "I took the levels on the land lying west of the ditch, the place known as the low sag spoken of there, and I found that that land was a little more than a foot lower than the top of the water in the ditch at the present time, or about two feet and a half below high-water mark in the ditch. There were no vines on the land. There was a tract there with no vines on, quite low, and at one point I observed some tules growing and some water grass that would indicate that it was somewhat swampy." He testified that continuing his levels in a southerly direction about eighteen hundred feet to another low sag in the vineyard he found it about a foot lower than the first one, and that "grape vines were growing down there," and that the grade fall of the country southward was about four feet to the mile. The second sag was about a quarter of a mile west of this north ditch. The witness observed that the vines "seemed to be growing all right except this one place." He further testified: "The ditch is about eighteen feet wide opposite this low sag in the land; the ditch had some trash on the bottom. I believe there was some kind of water-grass, something of that kind growing in it. I didn't observe it very closely there, that is, the ditch itself. I know there was some trash in the bottom of the ditch that looked like an old fish-trap and also some weeds, as though it had not been cleaned for some time; I don't know for how long. It had not been cleaned out recently, at least. The water in it appeared to be standing; there was no current to it." On cross-examination he testified: "I do not know that there was anything to prevent the water running out, not along that portion of the ditch. I didn't follow it down. The effect on the water that might come into the ditch by the presence of this grass and old fish-trap and tules in the ditch would be a tendency to retard the water. If the water is retarded somewhat in the ditch it would naturally have the effect of increasing the seepage from the ditch. It would retard the flow of the water along the sides and the bottom. . . . At that place there was more than ample space in

the ditch for water through the ditch. The water at that time was dead water, standing water.'' Witness Griggs testified: ''That when the south canal is filled up pretty well with water it backs up in the ditch north, and so far this year there has been no water coming down from the north, down from the other ditch, but the water is standing in that ditch there nearly to the north line here, up, I suppose, somewhere along in here (showing).'' He testified that he knew the land in 1902, and helped to handle the raisins that year; that ''there were raisins growing on there then (referring to the low place in plaintiff's land). There were a few dead vines, but the majority of it had vines on it. . . . There is nothing there at all now. He has taken the vines out of there.'' With some evidence as to the value of raisins for the two or three years preceding the trial, the plaintiff rested.

The learned trial judge gave expression to his view of the case, in directing the jury to find a verdict for the defendant, which is printed in the record. There being no question but that defendant was rightfully in possession of the canals with the right to use them for the purpose of running water through them, said the court: ''If damages result incidental to that use, it would be a great hardship to say that the use should not be permitted. In other words, if the defendant is here of right, then to charge it with damages it must be because of some particular acts of negligence or tortious acts for which it is said to be held guilty, and the damages must be, in addition to that, the proximate effect of this particular act of negligence. Now I fail to see or understand how in this particular matter the defendant is to be charged with any actionable negligence. Assuming that it might have kept the ditches cleaner than it did, still there is no evidence that the ditches were not entirely suitable for the purpose for which they were used—nothing of that kind, and we cannot say at this stage of the business of irrigation that it is necessary or absolutely requisite that a party appropriating and diverting water and delivering water must deliver it through channels that are so constructed that they will not permit of any possible percolation. In other words, that it must be delivered in pipes or cement channels or anything of that kind in the present stage of irrigation in this part of the state to say the least, and irrigation be practically an impossibility if it had to be done in that way, the business could not be carried on

and the people of the county would have to abandon their homes and their possessions practically, if that had to be done, because that would be practically impossible as it would seem.

"Whether that would be so or not, whether that is a speculation here or not, it is a fact that the business is conducted and has been conducted in a certain manner. Now, there is no evidence here, as I say, that this ditch—either one of these ditches—was not suitable for its purpose at the time, and has not been during the time that the plaintiff has been in possession of this property, there is no evidence that the defendant has used the property in any other way, or used the ditches in any other way, than the customary way. There is no direct evidence of any actionable negligence, as I understand it."

We have given the views of the trial judge quite fully because they seem to state the position taken by the respondent in support of the judgment. The general conditions existing in the irrigating districts of Fresno county are not shown, nor is there any evidence in the record to show that defendant was operating its system of ditches in the usual and customary way prevailing in the country. We do not think the case presents the question which the learned trial judge seems to have considered involved, and we are not called upon to pass upon it. There was some evidence brought out on the cross-examination of witnesses tending to show that the effect of irrigation throughout the district would cause the water plane to rise generally, in some cases almost to the surface, the purpose no doubt being to suggest a possible cause for the drowning of plaintiff's vines, caused by this universal seepage and percolation through the ditches. The court seemed to be impressed with the serious consequences which would flow from a rule that would accord damages for such apparently unavoidable cause.

We think, however, that the case as it now stands does not present an issue requiring so broad treatment. The evidence, it seems to us, is sufficient to present the question whether under certain circumstances actionable damages may not accrue through the escape by percolation or seepage of water from defendant's ditch to the tract of land mentioned. If, at that particular point in the ditch, the water was suffered through defendant's negligence to escape to plaintiff's land by means of faulty construction of the ditch, or by allowing the water to accumulate and stand there, and permitting the flow to be

obstructed by growing grass and tules and other obstructions, thus causing the water to seep or percolate to plaintiff's land to its injury, defendant would be liable in damages. We do not think there is any rule of law or any case holding that injury to land by seepage or percolation is under all circumstances *damnum absque injuria.* There may be as direct damage by this means as by overflowing the banks of a ditch, and the law will as readily redress injury resulting from the one cause as by the other when the facts satisfactorily locate the cause. The case of *Shields* v. *Orr Extension Ditch Co.,* 23 Nev. 349, [47 Pac. 194], is illustrative of the principle, and was a case where the injury was caused wholly by percolating water coming from a ditch. So, also, is the case of *Parker* v. *Larsen,* 86 Cal. 236, [21 Am. St. Rep. 30, 24 Pac. 989]. It was there said: ''Where one brings a foreign substance on his land he must take care of it, and not permit it to injure his neighbor. The law on the subject is tersely expressed in the maxim, *'Sic utere tuo ut alienum non laedas.' ''*

There was evidence tending to show that at the point of defendant's ditch in question the land of plaintiff had produced a good crop of grapes prior to 1902; that since then by means of seepage of water from the ditch about five acres of plaintiff's vines had been destroyed and the land rendered worthless; that at that point in the ditch the bottom was below the grade of the ditch, causing water to stand there; that water backed up in the ditch from the south ditch and stood there as dead water; that grass and tules and other obstructions had been allowed to accumulate at this particular point, the effect of which was to retard the flow of water when running through the ditch, and thus cause greater percolation and seepage than would otherwise have happened; that at another place in the vineyard, some distance from the ditch, though a foot lower, the vines were thrifty; that no water, except for two days, had been run through the north ditch past plaintiff's land, but that the water, backed up from the south ditch past the low place in plaintiff's land, had stood there during the irrigating season. There was no direct evidence establishing with absolute certainty cause and effect, but we think there were enough facts and circumstances to take from the court the right to direct a verdict. It was said in *Chidester* v. *Consolidated Ditch Co.,* 59 Cal. 197: ''In a case where reasonable men might, upon deliberation, differ in their conclusions, it

would be improper for this court to interfere with the verdict''; and it would be equally improper, in such case, to sustain an order directing a verdict.

The judgment is reversed.

Burnett, J., and Hart, J., concurred.