[Civ. No. 2479.   Third Appellate District.—November 3, 1922.]

## FREDERICK KALL, Respondent, v. WILLIAM M. CARRUTHERS et al., Appellants.

[1] TRESPASS—IRRIGATION—PERCOLATING WATERS—DAMAGES—INJUNCTION.—A property owner who by artificial means brings water upon
his lands for purposes of irrigation and allows a portion of such
water to so escape by percolation or otherwise as to injure the
land of the adjoining owner is liable to the latter in damages
for the injury caused; and an injunction will lie to prevent the
continuation of such injury.

APPEAL from a judgment of the Superior Court of
Sutter County.   K. S. Mahon, Judge.   Affirmed.

The facts are stated in the opinion of the court.

W. H. Carlin and Ray Manwell for Appellants.

Lawrence Schillig and Richard Belcher for Respondent.

ANDERSON, J., *pro tem.*—This is an action brought by
the plaintiff against defendants for the purpose of obtaining
an injunction restraining defendants from permitting water
brought from defendants' lands for the purpose of irrigat-
ing rice thereon to escape by percolation or otherwise upon
the lands of plaintiff.   Damages are also asked for the
injury.

The trial court found in favor of the plaintiff upon both
issues, granting the injunction and assessing damages to the
amount of sixteen hundred dollars.

We do not understand that appellant Carruthers (Mo-
homed did not file a brief) seriously contends that the
evidence is not ample in support of the findings of the

court. We have read the record and cannot doubt that the plaintiff was substantially damaged by reason of the escaping irrigation water; neither can we doubt that the escaping irrigation water came from defendants' lands. We think the destructive agency was clearly traceable to defendants' act in raising the water table by percolation upon adjacent lands.

The mode of establishing this fact is somewhat difficult, though interesting, but the means and methods of demonstration were placed in the hands of an expert, and were convincing to the trial court, who also viewed the lands, and, so far as we can observe, they do not call for criticism here. If more satisfactory methods existed for tracing the underground flow of the water, certainly they were not suggested to the trial court.

[1] The main question which we are called upon to consider here is stated in appellant Carruthers' opening brief, at page two, and is as follows:

"The point involved upon the appeal and the only one which is necessary to discuss is a rather vital one to farmers in Sutter County in the vicinity of the lands in question. Appellant owns a tract of land which is quite well adapted to the growing of rice, and he grew rice thereon during the year 1920. Respondent's land joins that of Appellant, but he had growing on his land an orchard of trees and vines; both parties irrigated their lands from water taken from the Sutter Butte Canal Co., a public utility irrigation company serving land in that vicinity. Necessarily the amount of water required by respondent for his fruit orchard was less than that required by Appellant for his rice crop. As we understand the case there is no claim made anywhere in the pleadings or Findings that appellant was guilty of any negligence or wrong doing except in so far as irrigating his land may be claimed to be a wrongful act."

Within the last decade an industry has sprung up in this state, and particularly in the Sacramento valley, which has attained such proportions that it is recognized as one of the leading agricultural enterprises of the state. It has made such strides that it is already guarded and protected by strong organizations. Millions of pounds of rice are now produced, whereas but a few years ago it was foreign to the soil. An industry which has thus made such rapid and

powerful advancement for supremacy in the field of agriculture must necessarily have come into conflict with and challenged at times the enforcement of certain well known and well settled legal rules. In consequence of the extraordinary and unprecedented growth of this industry there is much activity in passing ordinances and seeking restraining orders, agreements and other ways and means to control or minimize the effect of the encroachments of the operation of this industry upon the established rights of other industries.

Some of the evils complained of are the scattering of seed of obnoxious weeds, raising the water table—resulting in the destruction of all tree and plant life known as "non-water-growing" vegetation; also causing minerals, such as alkali, to rise to or near the surface of the ground, thus destroying all plant and tree life; and the destruction of the public highways of the most permanent nature being also involved. Some of the objections to the effect of the industry have found expression in rules made for the benefit of the public health, such as rules prohibiting the collection of foul, polluted, swampy, mosquito breeding pools.

The quantity of water used in the industry has greatly taxed the capacity of the streams and other sources of water supply; so great indeed has this become that it has been claimed that the principal waterway of the state has been so reduced at times that the ocean waters have found entrance so far up into the mouth of the channel as to affect the water for general domestic purposes, rendering it unfit for use for large numbers of the inhabitants along the river. In addition to this, further new and unprecedented conditions have arisen when the rice has matured and the time come for discharging the great volume of water, known as drainage water, which has accumulated during the rice season.

That the industry is an important one none can doubt; that it has added greatly to the material wealth of the state has been abundantly proven; and yet it may be added that the industry is only in its infancy, with a field of future development before it which is almost limitless. From what has been stated it will readily be seen that we have most unusual conditions to deal with by reason of this new industry. There can be no proper comparison made of the

conditions resulting from the growing of rice, with those arising from the irrigation of any other well-known product, such as alfalfa, trees, grain, etc. For the rice industry a large volume of water must be held on the ground for five or six months continuously.

The precise obligation imposed by law upon one who collects waters in an artificial reservoir is a subject of grave dispute. In *Fletcher* v. *Rylands,* L. R. 1 Ex. 265, L. R. 3 Eng. & Ir. App. 330, it was declared that no amount of diligence is a legal excuse if such water escapes and damages another. The effect of this doctrine is everywhere conceded to make every person who brings a foreign substance upon his property an insurer against all damage that may result by reason of its presence on his property.

The soundness of this doctrine has been much discussed by law writers and courts in England and in this country, and there is no case on the subject in either country so much cited and considered. This doctrine is frequently applied to other subjects, for example, the handling of explosives, setting of fires, keeping wild animals, alkali works, and numerous other subjects. But confining ourselves for the present to its relation to the water question, we think we may say the doctrine is generally accepted both here and in England, with the modification that an act of God may be interposed as a defense, such as extraordinary disturbances of the elements resulting in floods and earthquakes, in the breaking of ditches, reservoirs, etc., and this exception was declared in the recent case of *Sutliff* v. *Sweetwater Water Co.,* 182 Cal. 34 [186 Pac. 766].

We find the tendency among the courts in a great majority of the cases to give *effect* to the rule by finding negligence in some form and putting the decision on that ground; others give *effect* by characterizing the result as a nuisance, but declaring some of the acts appearing in such cases to be negligence. Still others give *effect* on the ground of "absolute liability," or hold the party impounding the water as an "insurer." The tendency of the courts is to avoid resting the decision upon the two latter grounds.

The great majority of the cases arise from seepage, from overflowing or breaking of ditches, reservoirs or dams; comparatively few arise from percolating or overflowing waters from adjoining lands.

No essential difference is usually recognized between damages caused from surface overflow and damages caused by direct percolation, reasonably traceable, whether the construction was apparently reasonably sound originally, or apparently originally imperfect. Whether the seeping nature of the soil is known or unknown at the time of construction, the responsibility is usually held to be the same; it must be remedied by effectual intercepting trenches, by cementing, or by other means known to science. In other words, the artificial receptacle for holding the liquid, be it of whatever form or nature, must be made and maintained as nearly waterproof as human agency can reasonably and prudently make it. Otherwise, if the escaping water results injuriously by reason of the receptacle failing to properly hold the water, it then falls within the category of nuisances, or under the condemnation of negligence.

The principle of negligence in some form is most frequently interwoven in the decided cases. In some of the cases it is at times difficult to determine whether it would be more accurate to say that it is not a question of negligence, and that the defendant is liable, even in case of latent defect, than it would be to say that the *escape of the injurious water,* in the absence of proof of inevitable accident or of the wrongful act of a third person, or of an act of God, is *in itself* sufficient evidence to prove negligence.

In the case now under consideration we may very properly liken the receptable holding the water on the rice to a large reservoir (or to a *"pool,"* as described in the case of *Parker* v. *Larsen,* 86 Cal. 236 [21 Am. St. Rep. 30, 24 Pac. 989]) in area, though not in depth, but being one constantly replenished in order to maintain an even depth for many months, thus keeping a perfect saturating medium on the ground to run or seep into the ground any place or anywhere that water will naturally flow; the sides and bottom of this receptacle having the usual defects common to uncemented ditches, reservoirs, dams and drains, in being not water-proof or sufficiently so to reasonably retain the impounded water.

The liability of the water to do injury if allowed to escape must be continually borne in mind by the one attempting to make artificial use of it, and his failure to bear that fact in mind may be material upon the question of his liability.

The fact that water in small quantities may be handled without doing material injury to adjoining property brings such cases "peculiarly" under "the application of the principle that the injury itself is evidence of negligence." This is well stated in a note in 1 L. R. A. (N. S.) 596, as follows: "The persistence with which water will seek its level renders the artificial accumulation of it above the ordinary level of the surrounding country more or less dangerous according to the quantity of water accumulated and the susceptibility of adjoining property to injury in case of its escape. The result is that there has been some tendency on the part of the courts, as represented in the case of *Rylands* v. *Fletcher*, L. R. 3 H. L. 330, 37 L. J. Ex. (N. S.) 161, 19 L. T. (N. S.) 220, to hold one who accumulates water in large quantities as an insurer. On the other hand, water may be accumulated in small quantities without material danger to adjoining property. At the same time, the very facts that it is so, and that ordinary precaution will prevent injury from the accumulated water, render the case peculiarly one for the application of the principle that the injury itself is evidence of negligence."

It will be noted in the decisions of our own state that the old maxim, "So use your own as not to injure another's property," has been so often approved in cases similar to the one at bar, and such cases have been decided by this maxim so many times, that the maxim should be decisive of this case.

"The law," says Chief Justice Parker in *Thurston* v. *Hancock*, 12 Mass. 220 [7 Am. Dec. 57], "founded upon principles of reason and common utility, has admitted a qualification to the absolute dominion of the proprietor of lands over it, restricting him so to use his own as not to injure the property or impair any actual existing right of another."

Under the subject of "Nuisances," Judge Cooley, in his work on Torts, says: "If the water is so raised that by percolation the land of another is injured, the party raising it is responsible, not because he has unreasonably, negligently, intentionally or unexpectedly flowed the land of another for his own benefit, but because he has done it in fact. The right of one to be secure against the undermining of his buildings by water, or the destruction of his

crops, or the poisoning of the air by the stealthy attacks of an unseen element, is as complete as his right to be protected against open personal assaults or the more demonstrative but not more destructive, trespass of animals." (See, also, *Pixley* v. *Clark*, 35 N. Y. 520 [91 Am. Dec., p. 81].)

Wood on Nuisances says: "The thing done or maintained may be injurious to property, and affect the free use of it, and in that way be a nuisance."

It is stated in Cyc., under the head of "Nuisances": "Every enjoyment by one of his own property which violates the rights of another in an essential degree, constitutes a nuisance."

Section 3479 of the Civil Code of the state of California declares, among other things, that "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property," is a nuisance.

In the case of *Paolini* v. *Fresno Canal etc. Co.*, 9 Cal. App., at page 8 [97 Pac. 1130], it is said: "There may be as direct damage by this means as by overflowing the banks of a ditch, and the law will as readily redress injury resulting from the one cause as by the other when the facts satisfactorily locate the cause. The case of *Shields* v. *Orr Extension Ditch Co.*, 23 Nev. 349 [47 Pac. 194], is illustrative of the principle, and was a case where the injury was caused wholly by percolating water coming from a ditch. So, also, is the case of *Parker* v. *Larsen*, 86 Cal. 236 [21 Am. St. Rep. 30, 24 Pac. 989]. It was there said *'Where one brings a foreign substance on his land he must take care of it, and not permit it to injure his neighbor. The law on the subject is tersely expressed in the maxim, Sic utere tuo ut alienum non laedas.'* " (Italics ours.)

The foregoing case fully approves the doctrine declared in the case of *Parker* v. *Larsen, supra*. The case of *Parker* v. *Larsen, supra*, was not predicated upon a finding of negligence in so many words, as an examination of the original record will reveal, but there was a finding of damage. Speaking of this case in *Sutliff* v. *Sweetwater Water Company*, 182 Cal. 37 [186 Pac. 767], the court, speaking through Mr. Justice Olney, say: "The case was one coming directly within the maxim *'Sic utere tuo ut alienum non laedas.'* Of this character, also, is *Parker* v. *Larsen*, 86 Cal. 236 [21 Am. St. Rep. 30, 24 Pac. 989], where the defendant

permitted the water in a ditch which he had constructed on his land to percolate through the ground from the ditch on to his neighbor's land, saturating and injuring it.''

The case of *Parker* v. *Larsen* is cited with approval in *Mallet* v. *Taylor,* 78 Or. 208 [152 Pac. 873]. The syllabus of the Oregon case declares: ''A person who by artificial means causes water to *percolate* through the soil to the injury of his neighbor, does so at his peril, and is legally responsible therefor *irrespective of negligence.*'' (Italics ours.)

The conditions denounced by our supreme court in *Parker* v. *Larsen, supra,* while identical with the case here on principle, were much less aggravated and damaging than are those of the case under consideration; there the water was permitted to stand *"two or three times each summer,"* whereas in this case it is allowed to stand continuously part of the spring, *all of the summer* and part of the autumn season.

Other decisions bearing upon the question are: *Howell* v. *Big Horn Basin Colonization Co.,* 14 Wyo. 14 [1 L. R. A. (N. S.) 596, 81 Pac. 785]; *Reed* v. *State,* 108 N. Y. 407 [15 N. E. 735]; *Scott* v. *Longwell,* 139 Mich. 12 [5 Ann. Cas. 679, 102 N. W. 230]; *Gorham* v. *Grass,* 125 Mass. 232 [28 Am. Rep. 226]; *Pixley* v. *Clark,* 35 N. Y. 520 [91 Am. Dec. 72]; *Richardson* v. *Kier,* 34 Cal. 63 [91 Am. Dec. 681]; *Tormey* v. *Anderson-Cottonwood Irrigation District,* 53 Cal. App. 559 [200 Pac. 814]; *Galbreath* v. *Hopkins,* 159 Cal. 297 [113 Pac. 174]; *Hoffman* v. *Tuolumne County Water Co.,* 10 Cal. 416; *North Point Consolidated Irrigation Co.* v. *Utah and Salt Lake Canal Co.,* 16 Utah, 246 [67 Am. St. Rep. 607, 40 L. R. A. 851, 52 Pac. 168]; *Wilson* v. *New Bedford,* 108 Mass. 261 [11 Am. Rep. 352]; *Sylvester* v. *Jerome,* 19 Colo. 128 [34 Pac. 760]; *Esson* v. *Wattier,* 25 Or. 7 [34 Pac. 756]; *Shields* v. *Orr Extension Ditch Co.,* 23 Nev. 349 [47 Pac. 194].

Mr. Justice Peckham, in one of the leading cases—*Pixley* v. *Clark, supra*—ably states the rights of adjoining property owners and their reciprocal duties in the development of their respective interests, as follows: ''The defendants' counsel says that the defendants had the right to use this dam to use their water-power, 'and all that can be legally required of them is, that they shall exercise it so as not to

injure directly or unnecessarily the lands of their neighbor'; also, he says, that 'if one do a lawful act on his own premises, he cannot be held for the injurious consequences unless it was done so as to constitute actionable negligence.' These, like many general propositions, are plausible; but as applied to this case in the sense they are sought to be used, neither of them is law, and never was. Take the first. Is any such principle found in any case, or stated by any elementary writer, as that you have a right to use your water-power, and build a dam for that purpose, and if necessary to that end, you may flow and drown your neighbor's land provided you do not do so 'unnecessarily'—that you may do it so far as is necessary to the full and profitable enjoyment of your water-power, even though you flow and destroy his farm?

"The other proposition is very similar. Was it ever held or pretended that you might build a dam and flow another's land provided you were guilty of no want of care or skill in its construction? In fact, the better dam you make, the more skillful and perfect its construction, the more water you restrain and throw back, the greater the damage to the adjoining landowner. These are sound maxims, applied to many cases, but not to all. The latter may be admitted and applied here. The act of the defendants was lawful in building their dam so long as they did not injure their neighbor's land; the moment they so interfered by their dam as to· flow his land to his injury, the act was unlawful."

We are of the opinion that to permit the defendant to make his lands profitable, though it result in the utter destruction of the usefulness of plaintiff's lands, would violate every principle of natural right and justice, and cannot be supported by judicial authority.

It follows that the judgment should be affirmed, and it is so ordered.

Burnett, J., and Finch, P. J. concurred.