HIGHVIEW NORTH APARTMENTS, a
Partnership, Respondent,

v.

COUNTY OF RAMSEY, Appellant
(81–676),

City of Maplewood, Appellant (81–971),

City of North St. Paul, Appellant
(81–921).

Nos. 81–676, 81–971 and 81–921.

Supreme Court of Minnesota.

Aug. 20, 1982.

66

Tom Foley, County Atty., Steven C. De-Coster and David MacMillan, Asst. County Attys., St. Paul, for Ramsey County No. 81–676.

Maun, Green, Hayes, Simon, Murray, Johannenson & Brehl and Merlyn C. Green, Lais, Bannigan & Cerisi and John F. Bannigan, Jr., St. Paul, for City of Maplewood No. 81–971.

Memmer, Casell, Parks & Beck, Seldon H. Caswell and Gregory J. Tavernier, St. Paul, for City of North St. Paul No. 81–921.

Leonard, Street & Deinard, Nancy C. Dreher and Richard Rapson, Minneapolis, for respondent.

**SIMONETT, Justice.**

Defendant municipalities appeal from a judgment holding them liable on a nuisance theory for damages to plaintiff's property attributed to defendants' water drainage systems. Defendants contend that no causal connection between their actions and plaintiff's damage was proven, that in any event nuisance does not lie, and that, at the very least, the damage award is improper and excessive. We affirm.

In early 1980 the plaintiff, Highview North Apartments, a partnership, sued defendants County of Ramsey, City of Maplewood, and City of North St. Paul. Fourteen years before, in 1966, Highview had built three apartment buildings on a 4-acre site in North St. Paul. Some 4 or 5 years thereafter, about 1971 or perhaps as late as 1975, water began to seep into the basements of two of the apartment buildings and create serious problems. In suing, Highview contended that the municipal storm sewer lines and holding ponds jointly planned and installed by the three defendants over the 14-year period were the proximate cause of the water damage to its buildings. Highview alleged counts of negligence, trespass and nuisance.

The district court, after a 40-day bench trial, found that defendants' activities had caused a flooding of plaintiff's basements; that this conduct constituted a nuisance; that since it was not feasible to abate the nuisance—the storm sewer system being in place—defendants should pay plaintiff damages of $189,833, of which $113,200 was for plaintiff to replace the unusable basement space; and that defendants were jointly and severally liable for the damages. We take up each of these points in turn.

**I.** The first issue is whether or not the actions of the defendant municipalities in the planning and implementation of their drainage system caused the water damage to plaintiff's apartment buildings. The trial court so found. Our role on appeal is not to retry the case but to determine only if the trial court's findings are clearly erroneous. We hold the trial court's findings on the issue of causation are not clearly erroneous.

The three apartment buildings are located at 2035, 2045 and 2055 North St. Paul Road in the City of North St. Paul. To the east some 100 feet is the boundary between North St. Paul and the City of Maplewood. The Highview tract is bounded on the west and north by Goodrich Golf Course, owned and operated by Ramsey County; on the south by North St. Paul Road, which runs at an angle from southwest to northeast; and on the east by Seventh Street, which runs north and south. North St. Paul Road was built at an artificial elevation substantially higher than the apartment site.

Surface water in the area, as well as ground water, flows generally from the southeast to the northwest. Thus, "upstream" in this locale means toward the southeast. Surface water collecting to the east and south of the Highview tract flows northwesterly, towards the Highview tract; it continues northwesterly through drain tiles under the "dike" of North St. Paul Road, across the Highview tract and into a "swale" near the west line of the Highview tract. The water then continues across the golf course to its northwest corner and beyond.

As stated, plaintiff built the apartment buildings in 1966, and they were put in use in 1967. At least until November 1971, the basements were dry. Either in late 1971 or in 1974, depending on which witnesses' testimony is believed, a serious water problem

began to be evident, and it grew worse as the years went by. By the spring of 1975, the basements in two of the buildings were flooded; water reached a depth of at least 6 inches; and sump pumps ran regularly in an attempt to keep up with the influx of ground water through the joints between the floor slab and the walls. Equipment and materials stored in the basements had to be removed.

Apparently the water table levels under the apartment buildings had risen.[1] The major fact issue at trial was the cause of the rise in the water table level. Was it simply a natural recharging of the water table from increased precipitation in the years after construction, compounded by initial mistakes in the siting of the two affected buildings, as defendants maintained? Or was it caused by the municipal storm sewer project, as plaintiff contended?

1. In 1966, North St. Paul decided to construct storm sewers, in part to facilitate drainage of the area on the southeast side of North St. Paul Road. This sewer line, known as the "North St. Paul 1966 line," would cross the Highview tract and drain into the Goodrich Golf Course. Part of the City of Maplewood would be drained by the proposed line as well. The city engineer for North St. Paul talked with the Maplewood and Ramsey County civil engineers and with one of the Highview owners, Sanders Ackerberg, because of the varying effect the proposed line would have on each party. The municipalities reached an informal agreement. Maplewood was to design the proposed line, North St. Paul would install it, and Ramsey County would take care of the drainage once it reached the golf course. According to North St. Paul's engineer, the municipalities understood that more storm sewers would have to be installed later in Maplewood which would drain into the same area at the golf course.

With this understanding, the drainage plan was implemented by these five steps:

1. In 1966, a 27-inch reinforced concrete storm sewer was installed on Highview's property, collecting water from Highview's 4-acre site. This line did not go under North St. Paul Road. It terminated at the west line of the Highview tract, at the edge of the golf course.[2]

2. In 1968 or 1969, Ramsey County shaped the area of the western swale so as to create a trilobal-shaped ponding area on the golf course near the discharge end of the North St. Paul line, in close proximity to the apartment buildings. A 2-foot raised berm was put across the swale.

3. In 1971, North St. Paul extended its 1966 sewer line under North St. Paul Road and to the south and northeast to service a watershed area of approximately 30 acres. The trilobal pond on the golf course was now continually full of water.

4. In 1974, Maplewood built a 30-inch storm sewer line to serve a watershed area of approximately 55 acres of urbanized land. This line also went under North St. Paul Road, then adjacent to the west boundary of the Highview property, terminating at the same trilobal pond as did the 1966 North St. Paul line.

5. In 1975, Ramsey County, responding to complaints that the trilobal pond was overflowing and flooding the golf course, enlarged the trilobal pond, now the "south pond" (removing some 700 cubic yards of dirt) and also excavated a depression north of the

1. According to Highview's experts, the water level under building 2035 had risen between 1965 and 1979 by 3.5 to 5.8 feet, so the basement slab which had been 3 feet above the water table when built was .5 to 2.8 feet below the top of the water table by 1979. Under building 2045, the water table level had risen from 7.2 feet below the slab in 1965 to about the elevation of the slab by 1979.

2. Highview granted an easement for the line to be on its property. The trial court found that in doing so Highview was not consenting to unanticipated future damage resulting therefrom.

trilobal pond (removing some 3,300 cubic yards of dirt) to create a second pond (the "north pond"). The berm across the swale was raised another 2 feet, and in 1977 an overflow pipe connection between the two ponds was installed.

The two detention ponds thus received and stored storm water runoff imported from a watershed of some 85 acres of developing urban land in Maplewood and North St. Paul. The two lines discharging into the ponds have a total capacity of 60 cubic feet per second. The ponds are designed to rise during storms to levels above the elevation of the basement slabs of plaintiff's apartments and to store up to 6 acre feet of storm water.

2. Highview's experts testified that, in their opinion, the rise in the ground water level under the apartment buildings was caused by the two detention ponds and that the ponds created an underground barrier which impeded the natural flow of ground water away from plaintiff's property, recharging the ground water levels upstream, thus forcing them to rise to unnatural heights throughout plaintiff's land. These opinions were explored in detail and had a credible basis. The trial court relied in large part on the testimony of Highview's experts, and we cannot say that doing so was clearly erroneous.

3. In appealing the trial court's finding of causation, the defendants note again the evidence they offered at trial. First, defendants argue the natural water table had once been much higher and point to the testimony of witnesses who lived in the area prior to 1958 and who recalled ponding in the swale and water collecting in parts of the area now known as the Highview tract. This testimony, however, was disputed by a prior owner of the property. Defendants attempt to cast doubt on the readings of the preconstruction site-boring tests conducted for Highview, suggesting the basement slabs may not have been above or were hardly above the then natural water level, but the trial court could have found otherwise, as it did. Defendants note that a drain tile system was installed during initial excavation for the basement of building 2035 to handle a water problem, but the trial court could have found, as it did, that the water problem was a result of heavy rainfall, not, as defendants suggest, from a piercing of the ground water table.

Second, defendants argue, apparently in support of their missiting contention, that water problems in the basements began earlier than Highview acknowledged. The trial court found that until November 1971 the basements of buildings 2035 and 2045 were substantially free of water leakage problems. Highview's evidence pointed to a later starting date, late 1974 or early 1975. Defendants' evidence supporting an earlier date was based on the North St. Paul meter readers, who testified they observed water in the basement in 1972, and on the testimony of a former caretaker, Joseph Flemino.[3]

However, much of the argument about a 1972 or a 1975 start of the water problem is irrelevant in view of the court's finding that, whichever date marked the beginning, water in the basements succeeded these actions: the 1966 line, the first regrading of the golf course, the two 1971 line extensions, and the appearance of a trilobal pond. Whatever basement water problems existed in 1972, they were far less severe than those of 1975 and 1976. This finding was not refuted by the appellants, although they argued further, and the court found, that the problem in building 2045 had lessened somewhat since 1976.

Last, again in support of the theory that the buildings were built below the level of the real water table, the defendants offered

---

**3.** Mr. Flemino testified that, when he started as caretaker in September 1972, the owner had already installed an outside "stand pipe" to handle water in the drain tile around the basement of building 2035. Maplewood cites this testimony along with that of one of the partners of Highview that the stand pipe was put in when the "basements were being flooded badly." Plaintiff disputes Flemino's credibility, pointing out he sued Highview after his employment was terminated. In any event, the stand pipe was added after the original construction and after the first of the defendants' changes in the area's drainage patterns.

evidence that the natural water table in 1965 was not at its highest point, as the court found, since measurements from a well located 1400 feet west of the south pond showed a level rising 7 feet from 1965 to 1971. The trial court, however, heard testimony from Highview that the well readings were not relevant to changes in the water table at the construction site because the well reached down to the aquifer, a source different from and deeper than the water table. The trial court also heard evidence based on weather statistics to support the 1965 high level.

It cannot be said that any of the trial court's findings cited above are clearly erroneous. Indeed, the defendants' most strenuous arguments do not challenge the overall direction of the findings: that basements basically dry for the first 5 years of their existence were, by 10 years after construction, beset with serious and continuing water problems. The findings of causation are affirmed.

II. The second issue is whether, on the facts found, plaintiff is entitled to recover for a nuisance. We hold that it can.

1. The trial court made no findings or conclusions on whether or not defendants were negligent. And since it was not claimed or shown that defendants' actions had diverted surface waters onto plaintiff's property, the trial court expressly found no trespass. Instead, the trial court found that the defendants had "intentionally and unreasonably" created an "absolute nuisance," and on this basis it found defendants liable to plaintiff.

Apparently the plaintiff and the trial court rely on Restatement (Second) of Torts § 822 (1977). There it is said one is subject to liability for a private nuisance "if, but

only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land," and if the invasion is either (1) "intentional and unreasonable," or (2) unintentional but actionable in negligence, or (3) actionable for "abnormally dangerous conditions or activities." Defendants' argument is that their invasion of plaintiff's property interests was not unreasonable and certainly not intentional,[4] and that if this is so, since the trial court did not find negligence and since defendants' actions cannot be characterized as abnormally dangerous, plaintiff has failed to prove any actionable wrong.

2. We do not, however, see a need to consider an application of the Restatement test of a nuisance, as our own statutory and case law is adequate to resolve the issues posed here. Minn.Stat. § 561.01 (1980) provides:

Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.

■ The statute defines a nuisance in terms of the resultant harm rather than in terms of the kind of conduct by a defendant which causes the harm. This is in accord with the historical evolution of nuisance since, as Prosser puts it, "Nuisances are types of damage * * *." Prosser, *The Law of Torts* 577 (4th ed. 1971). Yet there must be some kind of conduct causing the nuisance harm which is "wrongful." *See Randall v. Village of Excelsior*, 258 Minn. 81,

---

4. On the issue of what is intentional conduct, defendants point to Restatement (Second) of Torts § 825 (1977), which provides:

An invasion of another's interest in the use and enjoyment of land or an interference with the public right is intentional if the actor
  (a) acts for the *purpose of causing it*, or
  (b) *knows* that it is resulting or is substantially certain to result from his conduct.

(Emphasis added.) It is questionable whether this high standard of subjective intent is supported by the trial court's findings or by the evidence. Plaintiff argues intent can be inferred from failing to abate a nuisance which defendants know they have caused. But while defendants knew the basements were flooding, they disputed the cause, and it was not until a lengthy trial that the complex question of indirect causation was established.

85, 103 N.W.2d 131, 134 (1960). This wrongful conduct varies, and may at times be characterized as intentional conduct, negligence, ultrahazardous activity, violation of a statute or some other tortious activity. *See Randall, supra; H. Christiansen & Sons, Inc. v. City of Duluth*, 225 Minn. 475, 31 N.W.2d 270 (1948); *Mokovich v. Independent School District No. 22*, 177 Minn. 446, 225 N.W. 292 (1929).

▇ Where pollutants cause the harm, such as where sewage is deposited on plaintiff's property, the wrongful conduct appears to be self-evident. This is a classic instance of a harm from nuisance, sewage being unhealthy and offensive to the senses, and our cases appear to require only a showing of the harm and that it was caused by defendant's conduct. *E.g., Huber v. City of Blue Earth*, 213 Minn. 319, 6 N.W.2d 471 (1942); *Hughes v. Village of Nashwauk*, 177 Minn. 547, 225 N.W. 898 (1929); *Nienow v. Village of Mapleton*, 144 Minn. 60, 174 N.W. 517 (1919); and *Joyce v. Village of Janesville*, 132 Minn. 121, 155 N.W. 1067 (1916). On the other hand, a plaintiff might choose to bring a negligence action to recover for nuisance damages where the facts are appropriate, as, for example, in *Pettinger v. Village of Winnebago*, 239 Minn. 156, 58 N.W.2d 325 (1953) (sewage backed up into basements because the municipality was negligent in improperly sealing the clay tile sanitary sewer line). Although negligence may be the cause of a nuisance, it is not necessarily an element of a nuisance action, as we pointed out in both *Mokovich, supra*, and *H. Christiansen & Sons, Inc., supra*.

▇ 3. In this case the harm consists of ground water seeping into, or threatening to seep into, two apartment building basements, a condition which is ongoing, injurious to the premises, substantial, and likely to worsen. The trial court found that this harm is the result of the defendant municipalities having collected surface waters from an urbanized watershed of some 85 acres into its storm sewer system, then discharging these waters into two detention ponds located on the land of one of the defendants, thereby creating a damming ef-

fect on the underground water and abnormally raising the water table under plaintiff's basements. It seems to us that this kind of harm is a nuisance damage as contemplated by Minn.Stat. § 561.01 (1980) and our case law.

▇ 4. Having said this, the question remains how liability for that harm is to be characterized and determined. Section 561.01 codifies an equitable cause of action; consequently, it implicitly recognizes a need to balance the social utility of defendants' actions with the harm to the plaintiff. Specifically, the balancing occurs in this case with respect to the diversion of surface waters and its effect on the ground water table. In addition to the equitable approach contemplated by our statute, we have in this state a well-established doctrine governing interference with a plaintiff's use of his property resulting from a defendant's use of water on his own land. This is the doctrine of "reasonable use," which goes back at least to the leading case of *Sheehan v. Flynn*, 59 Minn. 436, 61 N.W. 462 (1894). *See* Kinyon & McClure, *Interference with Surface Waters*, 24 Minn.L. Rev. 891, 908–13 (1940) (which remains an excellent exposition on its topic). This is a flexible doctrine, presenting a question of fact to be resolved according to the circumstances of each case. *Sachs v. Chiat*, 281 Minn. 540, 162 N.W.2d 243 (1968).

Several factors make up the balancing test. Drainage of surface waters from one's own land onto another's is a "reasonable use" if there is a reasonable necessity for such drainage, if regard is taken to avoid unnecessary injury to others, if the utility or benefit to the land drained outweighs the harm to the land receiving the water, and if, where practicable, the drainage is done by improving the natural system or providing a feasible artificial one. *Enderson v. Kelehan*, 226 Minn. 163, 32 N.W.2d 286 (1948). In *Enderson*, for example, the defendant drained some 15 acres of farmland, creating shallow ditches along the natural drainage course for surface waters, thereby diverting the surface waters onto a larger depression on plain-

tiff's land. This court found the drainage plan was reasonable, was reasonably necessary to increase defendant's tillable acreage, and that diversion of the water into the natural basin on plaintiff's land resulted in relatively minor harm to plaintiff's property; we concluded defendant was not liable to plaintiff.

Most often the cases have involved the direct intrusion of surface water on the land of plaintiff and are considered trespass actions, but even so, conduct is examined in light of the reasonable use test. *See Pell· v. Nelson*, 294 Minn. 363, 201 N.W.2d 136 (1972) (an unreasonable diversion of surface waters off defendant's farmland); *Will v. Boler*, 212 Minn. 525, 4 N.W.2d 345 (1942) (damming a swale not a reasonable use). The same reasonable use test has been applied in other states to injury from underground waters if the added difficulty of proving the relevant facts and the alleged causation can be overcome. *Deyo v. Athol Housing Authority*, 335 Mass. 459, 140 N.E.2d 393 (1957); *Kall v. Carruthers*, 59 Cal.App. 555, 211 P. 43 (1922). *See also Nelson v. Wilson*, 239 Minn. 164, 58 N.W.2d 330 (1953), where the reasonable use test was applied to a claim that a "negligent trespass" amounted to a taking. *And see also Crookston Cattle Co. v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 774 n. 3 (1980) (dictum that reasonable use test may apply with respect to using underground waters).

In a case where the plaintiff had chosen to sue in negligence for harm caused by a diversion of surface water, it is interesting to note that we nevertheless analyzed the liability on appeal in terms of the reasonable use test. *Bush v. City of Rochester*, 191 Minn. 591, 255 N.W. 256 (1934). In *Bush*, we pointed out that "reasonable use" is not to be confused with "reasonable care," a negligence concept; "reasonable use" refers rather to a reasonable regard for the rights of others so that harm may be prevented or minimized.

■ We have long held that municipalities are subject to the reasonable use test with respect to surface waters diverted by street improvements. *E.g., O'Brien v. City of St. Paul*, 25 Minn. 331 (1878); *Bush v. City of Rochester, supra.* We see no reason why the same test should not govern where surface waters are diverted by a municipal storm sewer system. We hold, therefore, that on a claim of nuisance under section 561.01 for diversion of surface waters by reason of a municipal storm sewer system, interfering with a plaintiff's use of his property, the municipality's liability is to be judged by the reasonable use test. In saying this, it bears repeating that "[w]hat is a reasonable use is a fact question to be resolved in each case." *Pell v. Nelson*, 294 Minn. 363, 366, 201 N.W.2d 136, 138 (1972).

■ 5. Here the trial court did not consciously apply the reasonable use test, but consideration of reasonable use is implicit in the result.[5] In finding a nuisance, the trial court concluded that defendants' actions were unreasonable. The question, then, is whether that finding of unreasonableness is clearly erroneous. We conclude it is not.

In applying the balancing approach, it can be said, as defendants say, that the drainage of 85 acres of urbanized watershed outweighs, in terms of social utility, the harm to plaintiff's apartments. It can also be said, as Ramsey County says, that it is resonable, indeed, appropriate, to have ponds on a golf course and that ponds are environmentally beneficial. But "reasonable use" requires not only that the defendants' improvement be reasonably necessary, and that the benefit exceeds the harm, but that the improvement avoid unnecessary

5. The trial court characterized defendants' conduct as an "absolute nuisance" in the sense of a nuisance that does not arise out of negligent conduct. Prosser mentions that some courts have so used the term but cautions against its extended use. Prosser, *The Law of Torts* 582–83 (4th ed. 1971). We think that we are better off without the term. To speak of an "absolute nuisance" is misleading since, even in the absence of negligence, nuisance liability involves a balancing of the equities and, in this case, application of the reasonable use test. Not only is the phrase misleading, but it suggests both too much and too little and is of no use as an analytical tool.

harm to others. Here the trial court found that it was unreasonable for the municipalities to locate the two detention ponds almost directly on plaintiff's property line, in close proximity "downstream" to apartment buildings 2035 and 2045. The two sewer lines could have been extended entirely across or further into the center of the golf course, thus requiring either no detention ponds or ponds further distant from plaintiff's property. The trial court found these were reasonable alternatives which would have prevented harm to plaintiff.

■ We hold that the trial court's finding that defendants obstructed the free use by plaintiff of its property by maintaining something "which is clearly an unreasonable thing in view of its surroundings" has adequate evidentiary support and is not clearly erroneous. We hold the harm thereby caused constitutes a nuisance under section 561.01, for which defendants are liable.

III. Defendants next question the award of damages and the amount of damages. The trial court found a nuisance, found the plaintiff had no adequate remedy at law and found plaintiff was entitled to injunctive relief; but the court then chose not to enjoin the nuisance, since abandonment of the system would "perhaps be difficult and costly." Neither did the court believe defendants' proposals to make changes in their system would sufficiently safeguard plaintiff's property from further water intrusion. Consequently, the court fashioned relief permitting plaintiff to abandon the two basements, fill them in, and then build substitute facilities on grade at an awarded cost of $56,000 per building.

■ 1. Defendant North St. Paul argues that the trial court should have abated the nuisance rather than award damages. The statute provides that a remedy may include injunction, damages or a combination of both. Minn.Stat. § 561.01 (1980). The choice or combination of these forms of relief is within the trial court's discretion, and, on appeal, we are limited to consideration of whether this discretion has been abused. *Robinson v. Westman,* 224 Minn. 105, 29 N.W.2d 1 (1947). We conclude the relief fashioned here by the trial court was within its proper discretion.

■ 2. The trial court also awarded $76,633 for damages to real and personal property and for disruption and inconvenience caused by the nuisance.[6] *Holmberg v. Bergin,* 285 Minn. 250, 172 N.W.2d 739 (1969). Defendants dispute most of the items comprising this award, contending, among other things, that the loss of use item for the subbasement of building 2045 was excessive since water intrusion in that building was much less than in 2035, and that the $30 hourly rate for the owner's time was excessive. We conclude, however, there is evidence to support the trial court's award of damages.

■ IV. After the court made its decision, defendant Maplewood moved for an order allocating fault among the codefendants. The trial court denied the motion, ruling the defendants were jointly and severally liable for all the damages awarded. Maplewood appeals this ruling. We affirm.

Presumably, Maplewood raises the fault allocation question because, among other things, on the causation issue it contended water was collecting in the golf course ponding area and in plaintiff's basements before Maplewood's line was installed in the fall of 1974. This takes, however, too narrow a view of the evidence. As the trial court found, all three codefendants were aware of and actively participated in the formulation of the comprehensive drainage plan and, over the years, took various roles in the implementation of the plan. Thus the 1974 Maplewood line was installed in accordance with the original 1966 understanding of the parties. And Maplewood and Ramsey County cooperated in planning

---

**6.** This award consisted of: $12,750 for loss of use of the two basements; $30,000 to repair the subsoil bearings; $12,622 for damage to boilers and other equipment; $1,000 for items lost in the periodic flooding; $240 for carpet; $5,100 for the caretaker's time; $1,221 for installation of a culvert and sump pumps; $500 for electricity to run the pumps; $1,200 for replacement of sump pumps; and $12,000 for the owner's time in coping with the water problems.

and excavating the north and south ponds on the golf course.

The trial court found that the actions of the codefendants were incapable of apportionment; that their actions and responsibilities were not separate and distinct; and that, in effect, they did not act independently of one another but rather together as one group. By denying Maplewood's motion and ruling liability to be joint and several, the trial court has, in effect, allocated equal responsibility among the codefendants. We cannot say the ruling is clearly erroneous, and we affirm.

Affirmed.