Ralph SLETTEN, et al., and Ronald Brzinski, et al., Respondents,

v.

RAMSEY COUNTY, petitioner, Appellant.

No. C2–01–1066.

Supreme Court of Minnesota.

Feb. 26, 2004.

Susan E. Gaertner, Darwin Lookingbill, Bennett Rosene, Ramsey County Attorney's Office, St. Paul, Jerome A. Miranowski, John F. Beukema, Rikke A. Dierssen-Morice, Faegre & Benson, L.L.P., Minneapolis, for Appellant.

Robert A. Hill, Robert Hill & Associates, Ltd., Minneapolis, Gary Van Cleve, John J. Steffenhagen, Larkin, Hoffman, Daly & Lindgren, Ltd., Bloomington, for Respondent.

Susan L. Naughton, League of Minnesota Cities Association of Minnesota Counties, St. Paul, for Amici Curiae.

## OPINION

GILBERT, Justice.

This case arises out of Ramsey County's operation of a compost site on Beam Avenue in Maplewood, Minnesota, from 1984 to 1996.[1] Appellant Ramsey County appeals from a decision of the court of appeals affirming the district court's denial of official immunity on respondents' nuisance and negligent failure to warn claims. We affirm on respondents' nuisance claim but reverse on the negligent failure to warn claim.

The respondents include 14 members of three separate families, the Slettens, the Brzinskis, and the Behrens, who reside in close proximity to the compost site (hereinafter collectively referred to as the "Slettens"). The Slettens allege that the compost site exposed them to foul odors, interfered with the use of their property, and caused acute and chronic health problems due to exposure to airborne pathogens (bioaerosols), specifically aspergillus fumigatus spores. The Slettens brought claims against Ramsey County in 1997 and pleaded a variety of theories of recovery: negligent operation of the compost site, trespass, abnormally dangerous activity, maintenance of a nuisance as defined by Minn.Stat. § 561.01 (1996), negligent failure to warn of the dangers of bioaerosols, negligence, nuisance per se, and violation of the Minnesota Environmental Response and Liability Act, also known as MERLA.[2]

### A. Capacity Restrictions on the Site

Ramsey County was required to obtain approval from two governmental units to operate this facility: the City of Maplewood and the Minnesota Pollution Control Agency (MPCA). Ramsey County conceded that the site was regulated by the MPCA. In the MPCA's "Permit-by-Rule Facility Notification Form," Ramsey County certified on May 23, 1990 that it would compost grass and leaves and that the total "facility design waste capacity at the site would be 9,000 cubic yards."[3]

---

1. The site remained open from 1996 until June 2000 as a yard waste transfer site. Ramsey County operated the compost site jointly with the City of Maplewood from 1984 to 1990.

2. The Slettens alleged violations of numerous statutes and rules in their amended complaint of June 10, 1998. These included, but were not limited to, a violation of Minn. R. 7001.0010 (2001) et seq. and Minn. R. 7035.2836 (2001), which include regulatory operational requirements, test results, annual reports, facility design capacity, types of

waste and termination of the Permit-by-Rule for noncompliance with Minn. R. 7035.2836, subd. 3 (2001).

3. The letter granting approval stated, "[t]his will be considered a permit-by-rule yard waste compost facility based on Minnesota Solid Waste Management Rules (Minn. R. ch. 7035). Also, based on Minn. Rules pt. 7001.3050, subp. 3, item C, the owner/operator is considered to have obtained a solid waste management facility permit without making application for it * * *." Chapter 7035 of the Minnesota Rules requires com-

The capacity restrictions were part of the representations Ramsey County made in order to obtain Permit–by–Rule approval from the MPCA. This capacity limit followed the MPCA mandate that "about one acre of land is needed for each 3,000 to 3,500 cubic yards of yard wastes collected." Based on this certification, on July 5, 1990 the MPCA approved Ramsey County's application to compost a maximum of 9,000 cubic yards of grass and leaves on the Beam Avenue site. Ramsey County alleges that it complied with the MPCA's rules. Rebecca Wirth, a MPCA senior pollution control specialist responsible for regulating yard waste sites in Minnesota, including the Beam Avenue site, states that the "notification form filled out by an owner or operator of a yard waste composting facility is not a permit and does not have the force of law." According to Wirth, "[t]he permit is the rule itself, which contains all of the requirements with which the owner or operator must comply."

In August of 1994, the Ramsey County Division of Solid Waste submitted a report to the Maplewood City Council concerning the Maplewood yard waste site. This information was submitted to the city as background for review of the conditional use permit (CUP) for the yard waste site in issue. The following summary illustrates that there were approximately 60,-000 visits per year to the site from 1990 to 1994 and that a total of 117,295 cubic yards were received at this site during that time. According to this summary, 39,463 yards were transferred to other locations, leaving over 77,832 cubic yards at the site.

| Year | No. of Visits | Cubic Yards Received | Cubic Yards Managed on Site | Cubic Yards Transferred |
|---|---|---|---|---|
| 1990 | 60,041 | 19,123 | 10,000 | 9,123 |
| 1991 | 62,497 | 23,615 | 15,905 | 7,710 |
| 1992 | 60,491 | 22,477 | 17,317 | 5,160 |
| 1993 | 66,901 | 27,480 | 21,240 | 6,240 |
| 1994 | 63,127 | 24,600 | 13,370 | 11,230 |
| | | 117,295 | | 39,463 |

Beginning in 1991, the City of Maplewood, as regulator, placed restrictions on the operation of the compost site by adopting a CUP, which established the requirements for continued operation of the site.[4] The city council issued the CUP with the resolution that the "use would not depreciate property values" nor would it "involve any activity, process, * * * or methods of operation that would be dangerous, hazardous, detrimental, disturbing or cause a nuisance to any person * * * because of * * * dust, odor * * * or other nuisances" and "the use would cause minimal adverse environmental effects." The neighbors of the site had raised concerns about strong odors emanating from the compost site starting in the late 1980s. The CUP specifically conditioned Ramsey County's

post facilities receiving yard waste to be in compliance with Minn. R. 7035.2836, subps. 2 and 3 (2001). These subparts require the owner to submit a notification form to the commissioner on a form prescribed by the commissioner before beginning facility operation and the notification must include, among other things, "the facility design capacity." Subpart 3(G) requires an annual report detailing the type and quantity by weight or volume of yard waste received at the compost facility.

4. November 1991 Conditional Use Permit Resolution No. 91–11–149, amended in 1994 by Conditional Use Permit Resolution No. 94–05–48, amended in 1996 by Conditional Use Permit Resolution, No. 96–10–116.

agreement upon not composting grass clippings at this site, noting "[t]he County shall have the grass clippings removed from the site as often as necessary to prevent odors."

In 1994, the permit was amended to require Ramsey County to remove grass clippings at least three times per week: Monday, Thursday and Saturday. In 1996, the site was changed from a composting site to a yard waste transfer site. The site was to be monitored continuously when the site was open and a written record kept of "the haul out of materials." This was evidently required because of numerous complaints of odor generated at the site. The city also required Ramsey County to pay for an odor consultant, training of city staff for wind and odor monitoring and to pay for the hiring of a third party to verify and measure odors. Thirty-six of the 427 scheduled pickups of grass clippings on that schedule were not made between 1995 and 1999. Ramsey County concedes that these missed pickups were in violation of its CUP, but argues that the error was made by its contractor who "unilaterally" decided to skip the scheduled pickups. Ramsey County also argues that the amount was minimal and the problem was corrected upon discovery. In June 2000, the Maplewood City Council closed the Beam Avenue site.

B. *Slettens' Claims of Nuisance and Negligent Failure to Warn*

The Slettens allege that beginning in 1994 Ramsey County knew the ground water beneath the Beam Avenue site was contaminated by the release of a number of toxic chemicals dangerous to the environment. Due to this knowledge, the Slet-

tens argue that Ramsey County had a duty to warn all affected persons of the existence of such contamination and the necessity to take reasonable steps to avoid adverse health. The complaint included and incorporated an exhibit relating to the compost site monitoring report and a 1995 water quality monitoring summary report. The results of the report stated, in part, that the concentrations of aluminum, copper, lead, zinc and perhaps mercury exceeded the chronic standard for surface waters. Chronic standard is "the highest water concentration of a toxicant to which organisms can be exposed indefinitely without causing chronic toxicity." Minn. R. 7050.0220 (2001).

The Slettens allege that they suffered substantial physical injuries and property damage on account of the problems associated with this compost site. They allege that they experienced abnormally high incidences of nausea, headaches, fever, burning and watery eyes, skin rashes, sore throats and fatigue. The Slettens provided expert testimony that contained a diagnosis of Type III and Type IV hypersensitivity immune reactions caused by chronic exposure to numerous bioaerosols. They allege that the biological process and the quantities were not properly controlled at this site, and thus anaerobic bacteria resulted, producing not only vile odors, but also gram/negative bacteria and various pathogenic bioaerosols.

From 1990–1996, Ramsey County certified in required annual forms to the MPCA that the Beam Avenue site's yard waste capacity was 9,000 cubic yards. The Slettens allege that Ramsey County significantly exceeded its represented and authorized design capacity.[5] In 1993, for

---

5. In the complaint and in affidavits submitted by the Slettens in opposition to appellant's summary judgment motion, the Slettens summarized appellant's annual operating reports from 1990–1996, in which they alleged that appellant accepted waste in excess of what

example, Ramsey County received 27,480 cubic yards of yard waste and transferred only 6,240 cubic yards, leaving 21,240 cubic yards to be managed on the site, or 12,240 cubic yards over the permitted amount for compost. The permit violations led to the alleged formation of anaerobic bacteria and other pathogenic bioaerosols, as well as odorous compounds such as ammonia and hydrogen sulfide. Ramsey County's compost expert, Dr. Elliot Epstein, stated in a 1997 book that ammonia is released from decomposing grass clippings and when anaerobic conditions occur, odorous sulfide compounds such as hydrogen sulfide are produced.

The Slettens alleged that the county "per se" violated the Permit–by–Rule authority of the MPCA by composting yard waste in excess of permit restrictions. The Slettens further alleged that the county violated the "ministerial duty to abide by" the "operational parameters" of the CUP granted by the city by failing to remove thousands of cubic yards of grass clippings from the compost site in a timely manner. Ramsey County argued that it reported to the MPCA the amount of grass and leaves it received at the site, that it did not exceed the site's capacity, and that the site was described by the MPCA as a "model site." Zachery J. Hanson, the Environmental Health Director for the Ramsey County Department of Public Health, states that the "staff at the Maplewood site complied with MPCA rules pertaining to yard waste sites and the City of Maplewood's conditional use permit for the site."

## C. Ramsey County's Immunity Defenses and Summary Judgment Motions

The answer submitted by Ramsey County on December 22, 1997, asserted an affirmative defense of "both statutory and common law immunity" without specifying what theories of immunity it was relying on. In its first motion for summary judgment seeking immunity, Ramsey County sought statutory immunity and unimproved property immunity under Minn. Stat. § 466.03, subds. 6 & 13 (2002). The district court denied the request for immunity and the court of appeals affirmed. In the first appeal, the court of appeals held that "[b]ecause statutory immunity does not protect operational decisions, the district court did not err in denying [Ramsey County's] motion for summary judgment." *Sletten v. City of Maplewood*, No. C7–98–2377, 1999 WL 595368 (Minn.App.1999), *rev. denied* (Minn. Oct. 26, 1999) ("*Sletten I*"). The court of appeals further denied the request for unimproved property immunity because Ramsey County had actually improved the property. Ramsey County did not seek vicarious official immunity in its first summary judgment motion.

On December 22, 2000, Ramsey County brought another motion for summary judgment on a new theory of vicarious official immunity. Ramsey County brought this motion after extensive discovery.[6] Ramsey County argued that as a matter of law,

the MPCA "permit" allowed. The Slettens also alleged that from 1986 to July 1990, the city operated the site without authority. Further, the Slettens alleged that hazardous, toxic, and dangerous chemicals were illegally dumped or released at the compost site.

**6.** The pretrial discovery order in this matter was dated December 3, 1999. This order

required expert opinions to be disclosed by June 15, 2000, and closed all discovery as of October 22, 2000. Accordingly, Ramsey County raised its new vicarious official immunity defense almost 6 months after the parties were required to disclose their experts and 2 months after the close of all discovery.

it was not negligent in its maintenance of the Maplewood composting site, that the decisions as to when to turn the windrows [7] was discretionary and, therefore, Ramsey County was entitled to immunity for said actions. Ramsey County also argued that the Slettens had failed to demonstrate causation and damages as a result of, among other things, the grass hauling frequency, that the Slettens could not prove negligence in Ramsey County's operation of the site, and that they could not recover for nuisance, trespass or failure to warn. As part of this motion, Ramsey County attached copies of the city's CUPs and evidence of the MPCA's authority. Ramsey County only requested that immunity be applied to the turning of the windrows, which it characterized as a discretionary act. The district court characterized the challenged activities as "operational level activities" rather than planning or policy-making activities. Ramsey County claimed that the act of turning the windrows (when and how to turn them) falls under vicarious official immunity. Ramsey County also argued that there was a lack of evidence relating to the negligence claim regarding hauling of grass and control of water from the site. With regard to the failure to warn claim, Ramsey County argued that it had no duty to warn the neighbors concerning the results from a 1994 leachate water study and the Slettens suffered no damages.

### D. The Summary Judgment Rulings

On April 27, 2001, the district court granted summary judgment on the negligence claim, concluding that the activities complained of were covered under official immunity. The court also concluded that the Slettens had failed to show harm re-

sulting from the untimely grass clipping pickups. The court also dismissed the trespass to real property claim based on insufficient evidence and dismissed the MERLA claim based on not finding a hazardous substance present at the compost site. These issues are not on appeal.

▇ The district court denied summary judgment on the Slettens' claim that Ramsey County maintained a nuisance. The court concluded that the Slettens had submitted sufficient facts to raise an issue as to whether the compost site was offensive to the senses and interfered with the enjoyment of their homes. The court also reasoned that a nuisance claim was different than negligence because a nuisance claim focuses more on the problem created rather than the conduct. To maintain a nuisance action, a plaintiff need not establish a duty or a breach. The court concluded that genuine issues of material fact existed as to whether any of the claimed damages arose from the compost site's gate, driveway, retention ponds, and lighting.

The district court also denied summary judgment on the Slettens' negligent failure to warn claim, concluding that vicarious official immunity did not extend to this claim because the Slettens raised genuine issues of material fact as to whether Ramsey County had actual knowledge of dangerous conditions and assumed a "specific ministerial duty to warn" nearby homeowners about the health risks associated with aspergillus fumigatus. Ramsey County appealed the district court's partial denial of summary judgment, arguing that the district court erred when it declined to apply the doctrine of vicarious official immunity to the Slettens' nuisance and negligent failure to warn claims.

---

**7.** Windrows: Parallel rows of yard waste material approximately 10 to 12 feet wide, 5 to 8 feet high, and up to 100 feet long.

The court of appeals affirmed. *Sletten v. Ramsey County*, No. C2–01–1066, 2002 WL 109272 (Minn.App.2002), *rev. granted* (Minn. April 23, 2002) ("*Sletten II*"). It reasoned that Ramsey County could not have the discretion to operate a compost site that created a nuisance dangerous to public health, and thus held that under the facts alleged Ramsey County could not claim immunity on the nuisance claim. *Id.* at *2–3. The court of appeals also held that Ramsey County was not entitled to vicarious official immunity with respect to the negligent failure to warn claim because, under the facts alleged, Ramsey County had no discretion to decide whether to warn of known dangers, especially in light of its concession that it owed a duty and knew of the dangerous nature of the pathogens. *Id.* at *6–7. Some of the same day-to-day operational decisions of the composting facility decided in *Sletten I* are before us here. Ramsey County requested review on whether vicarious official immunity applies to nuisance and negligent failure to warn claims. We affirm the court of appeals in part, reverse in part, and remand to the district court for trial.

## I.

We first consider whether official immunity can apply to nuisance claims. Official immunity is a common law doctrine that protects government officials from suit for discretionary actions taken by them in the course of their official duties. *Kari v. City of Maplewood*, 582 N.W.2d 921, 923 (Minn.1998). The goal of official immunity is to protect public officials from the fear of personal liability, which might deter independent action and impair effective performance of their duties. *Elwood v. Rice County*, 423 N.W.2d 671, 678 (Minn.1988).

The applicability of immunity is a question of law, which this court reviews de novo. *Johnson v. State*, 553 N.W.2d 40, 45 (Minn.1996). Official immunity provides immunity from suit, not just from liability. *See McGovern v. City of Minneapolis*, 475 N.W.2d 71, 72 (Minn.1991). Therefore, the denial of a summary judgment motion based on immunity is immediately appealable because the immunity is effectively lost if the case is erroneously permitted to go to trial. *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 218 (Minn.1998) (citing *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986)). On appeal from summary judgment, we determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Watson v. Metro. Transit Com'n*, 553 N.W.2d 406, 411 (Minn.1996).

Prior to discussing the applicability of immunity in this context, we want to note the differences between affirmative defenses,[8] defenses, and immunities. We take this occasion to reiterate that it is important how the protection that may be available in this context is classified because the differences between affirmative defenses and immunities are significant for two important reasons. First, a party waives an affirmative defense if it is not included in a responsive pleading. Minn. R. Civ. P. 12.02. An immunity, although best included within an answer, is not waived if it is not included in the answer. Second, and of growing importance here, is that the application of an immunity typically is a matter of law that is best resolved before the parties engage in lengthy discovery. Affirmative defenses, on the other hand, often require so many factual inquiries. We treat affirmative defenses differently from immunities because they serve

---

8. Minn. R. Civ. P. 8.02.

different purposes. Whereas an affirmative defense protects the party from liability, immunity typically protects a party from the lawsuit itself. *See Anderson,* 393 N.W.2d at 364. As we noted in *Rehn v. Fischley,* 557 N.W.2d 328, 332–33 (Minn. 1997):

> The difference [between affirmative defenses and immunities] is more than mere semantics. The very foundation of an immunity's protection typically is grounded in the special status of a defendant. The traditional basis for immunity is that "though the defendant might be a wrongdoer, social values of great importance required that the defendant escape liability." * * * Unlike immunities, however, affirmative defenses "reflect the judgment that the defendant's action is not tortious at all, or if tortious, is morally justified." * * * In summary, an immunity focuses on a defendant, an affirmative defense on the defendant's actions.

(Citations omitted.)

The United States Supreme Court, in reviewing immunity, has made the same distinction. Citing to a prior case, *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court stated:

> *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

*Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). This distinction was later repeated by the Supreme Court in *Saucier v. Katz,* which stated that "[qualified immunity] is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (citation omitted, emphasis in original). Finally, even if there is no immunity from suit and no affirmative defenses available, a party such as Ramsey County may still have viable defenses to liability, causation and damages, which will be determined at trial.

■■■■ Ramsey County claims that as a governmental entity it is entitled to vicarious official immunity. While we have generally extended official immunity vicariously to governmental entities after a government employee has been allowed official immunity, vicarious immunity is not an automatic grant. *See Olson v. Ramsey County,* 509 N.W.2d 368, 372 (Minn.1993) (granting vicarious official immunity to county because to grant immunity to a county social worker but deny vicarious official immunity would deter county social worker's performance by focusing "stifling attention" on the social worker's performance "to the serious detriment of that performance"); *Pletan v. Gaines,* 494 N.W.2d 38, 41–42 (Minn.1992) (noting that vicarious official immunity is often impliedly granted when there is official immunity but that our cases have suggested that vicarious official immunity does not necessarily apply); *cf. S.W. v. Spring Lake Park Sch. Dist. No. 16,* 592 N.W.2d 870, 877 (Minn.App.), *aff'd without opinion,* 606 N.W.2d 61 (Minn.2000) (declining to extend official immunity vicariously to school district because it had not assigned a duty applicable to the employees' operational acts). No individual defendant has been named or is being sued in this case, but it is the nature of the employee's immune conduct, not whether

or not the employee is named as a defendant in a lawsuit, that determines the applicability of vicarious official immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316–17 (Minn.1998) ("To deny a government employer vicarious official immunity simply because the official was not named in the suit would allow plaintiffs to defeat immunity by declining to name the official as a defendant.").

We begin our official immunity analysis of this case by looking at the nature of the Slettens' claims. The Slettens claim that Ramsey County intentionally created a public health nuisance because it chose to maintain a condition causing them interference with full knowledge of the harm to the Slettens' families. The Slettens further argue this nuisance was created by Ramsey County's failure to adhere to state public health statutes, state permits, and local ordinances, which govern its conduct at the site. The Slettens reference capacity dumping restrictions, argue the city's CUP prohibits Ramsey County from composting grass, argue a violation of the nuisance statute, Minn.Stat. § 561.01 (2002), and allege a cause of action for the removal and abatement of this nuisance pursuant to Minn.Stat. § 145A.04, subd. 8 (2002). The Slettens also allege Ramsey County knew that families living near the site were getting sick and that a report issued in 1994 prepared by Ramsey County demonstrated Ramsey County's awareness of at least the release of aspergillus fumigatus and the dangers known to be associated with aspergillus. Based on these allegations, the Slettens allege that there was no discretion to continue operating the site. The district court agreed with the

Slettens and denied Ramsey County's motion for summary judgment on the allegations that Ramsey County was maintaining a nuisance, and the court of appeals affirmed.

 The Slettens argue that the nuisance statute, Minn.Stat. § 561.01 (2002), makes no immunity exception for public health nuisances perpetrated by the government. The Slettens are correct in asserting that the statute does not make an exception to liability for government officials.[9] We have pointed out that this statute defines a nuisance in terms of the resulting harm rather than in terms of the kind of conduct by a defendant which causes the harm. *Highview N. Apartments v. County of Ramsey*, 323 N.W.2d 65, 70 (Minn.1982). In *Sletten I*, and again in *Sletten II*, the court of appeals noted that the "'attributes of nuisance claims' did not support the county's statutory immunity claim." *Sletten II*, 2002 WL 109272, at *5 (quoting *Sletten I*, 1999 WL 595368, at *3). This distinction between the attribute of resulting harm and the kind of conduct has not been encompassed within our traditional official immunity analysis, however. Moreover, we have held that discretion has a broader meaning in the context of official immunity than in the context of statutory immunity. *See Watson*, 553 N.W.2d at 414. In *Watson*, we held that:

> Unlike statutory immunity, official immunity protects the kind of discretion which is exercised on an operational rather than a policymaking level. But the discretion involved with official immunity requires "something more than

---

**9.** Minn.Stat. § 561.01 (2002):

Anything which is injurious to health, or indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance. An action may be brought by any person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance, and by the judgment the nuisance may be enjoined or abated, as well as damages recovered.

the performance of 'ministerial' duties." * * * An official's duty is ministerial when it is "absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts."

*Id.* (citations omitted).

In support of their argument, the Slettens rely on this court's decisions in *Highview N. Apartments*, 323 N.W.2d 65 (Minn.1982); *Bohrer v. Village of Inver Grove*, 166 Minn. 336, 207 N.W. 721 (1926); *Bridgeman–Russell Co. v. City of Duluth*, 158 Minn. 509, 197 N.W. 971 (1924); *Kiefer v. Ramsey County*, 140 Minn. 143, 167 N.W. 362 (1918); *Joyce v. Village of Janesville*, 132 Minn. 121, 155 N.W. 1067 (1916); and *Batcher v. City of Staples*, 120 Minn. 86, 139 N.W. 140 (1912). The Slettens are correct in their assertion that this court has held government entities liable for common law nuisance claims. However, it is not clear that immunity was ever raised as a defense in those cases. When this court considered whether to apply immunity to a nuisance claim prior to the 1963 adoption of Minn.Stat. § 466.02 (2002) (Municipal Tort Liability), it applied it. *See Mokovich v. Indep. Sch. Dist. of Virginia*, 177 Minn. 446, 449, 225 N.W. 292, 293 (1929) (adopting the rule of nonliability to a nuisance claim and noting that, with respect to the liability of counties, towns, and school districts, case law has made no distinction between nonliability for negligence and nuisance except when the tort causes injury to private property rights). However, the immunity at issue in *Mokovich* was local government sovereign immunity, which has since been abrogated. *Spanel v. Mounds View Sch. Dist.*, 264 Minn. 279, 292, 118 N.W.2d 795, 803 (1962); Minn.Stat. § 466.02 (1963) (codifying abrogation).

Furthermore, Minn.Stat. § 145A.04, subd. 8 (2002), provides that a county's public health officials "shall order the owner or occupant of the property to remove or abate" any "threat to the public health such as a public health nuisance, source of filth, or cause of sickness." Minnesota Statutes § 145A.04, subd. 11 (2002), makes it a misdemeanor for a member or agent of a board of health to refuse or neglect to perform a duty imposed on a board of health by statute or ordinance. The Slettens raised this statutory obligation for the first time on appeal. Issues raised for the first time on appeal are not to be considered. *See St. Paul Citizens for Human Rights v. City Council*, 289 N.W.2d 402, 407 (Minn.1979). Therefore, the statute does not control our decision, but does highlight the importance the legislature has placed upon removing and abating public health nuisances.

The Slettens offered evidence relating to the ordinance and rule violations on capacity, arguing there was a violation of these limitations. In its April 27, 2001 order, the district court reasoned with regard to the Slettens' negligence claims that these theories were "untimely" and should not be considered by the court because they were not raised or disclosed before the discovery cutoff date established in the pretrial order. The court noted that the subject of composting was "beyond the normal experience of lay persons and requires the testimony of experts." While this may be true, the CUP facility limitation and the grass removal requirements were clear and unambiguous and were offered by Ramsey County in its motion for summary judgment. The Slettens argue the CUP limitations and grass removal requirements should be considered to defeat Ramsey County's claim of vicarious official immunity on the nuisance claim by demonstrating that Ramsey County's actions were ministerial in nature, rather than discretionary operational activities.

In our de novo review of the vicarious official immunity claim, we will take the operating permits into consideration.[10]

While the evidence of rule or ordinance restrictions may have broader evidentiary implications, it may also be used to rebut the belated theory of vicarious official immunity. Linking these alleged violations with causation and damages may require expert testimony, but that is not necessarily the case with regard to the official immunity analysis conducted by the court. The district court found that the Slettens had submitted sufficient facts in their responsive submissions to raise an issue for the jury as to whether the compost site was offensive to the senses and interfered with the enjoyment of their homes.[11] In our de novo review of vicarious official immunity, we consider the CUP as amended and the MPCA Permit–by–Rule.

 A goal of allowing government entities a right to appeal the denial of a summary judgment request for immunity from suit is to avoid delay and the expense of preparation and trial. *See McGovern,* 475 N.W.2d at 72 ("immediate appeal is necessary because immunity *from suit* is lost if the case goes to trial") (emphasis in original). However, this case was commenced in 1997 and now, 7 years later, after two appeals by Ramsey County, the goal of avoiding delay and expense has already been soundly defeated. In support of judicial economy, we would discourage government entities from bringing successive motions and appeals based on ever-evolving theories of immunity. *See Weckerling v. McNiven Land Co.,* 231 Minn. 167, 173, 42 N.W.2d 701, 704 (1950).

In *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 316 (Minn.1998), the ordinance at issue required the immediate repair of "any sidewalk slab projecting more than one inch above the adjacent slab." Discretion was unnecessary to determine if the criteria had been met to require the immediate repair of the sidewalk once an inspector identified the broken slab. *Id.* *Wiederholt* involved the city's own zoning ordinance, but in this case, Ramsey County was only authorized to operate this site on certain terms and conditions and its activities were proscribed by two other regulatory bodies. And while this situation did not involve an immediate repair obligation, it required an immediate and unconditional adherence to the limits set by the MPCA and the City of Maplewood. As we stated in *Wiederholt,* "public officials clearly have a duty to adhere to ordinances and statutes." *Id.* In the present case, adherence to the grass removal mandates of the CUP and facility design limitations was especially important in that the compost limits imposed by the MPCA and the city appear to have been designed specifically to avoid the type of nuisance problems the Slettens now assert occurred. The residents living close to the Beam Avenue site allege not only that they experienced odor problems emanating from the site since the late 1980s, but also that the site was alleged to have produced gram/negative bacteria, various pathogenic bioaerosols from an anaerobic fermentation process, resulting physical ailments, and property damage.

 The application of official immunity or vicarious official immunity to claims of nuisance is a question of law and involves a policy question dependent on

---

10. As part of our de novo review, we give "no deference to conclusions of the courts below." *Snyder v. City of Minneapolis,* 441 N.W.2d 781, 786 (Minn.1989).

11. Upon remand and trial, the district court may still preclude expert testimony in its discretion as to these ultimate factual issues of causation and damage.

the particular facts of the case. This analysis must take into consideration Minn. Stat. § 561.01 (2002), the nature of the Slettens' claim, and the particular government activity that is alleged to have given rise to this claim. The type of claim at issue, in this case nuisance, is not in itself dispositive of official immunity one way or the other. While we look into the cause of the nuisance and who created and maintained it, it is the nature of the underlying government activity that controls whether or not official immunity is involved. The court of appeals held that Ramsey County "[did] not have discretion to operate a compost site that creates a nuisance that is dangerous to public health." *Sletten II,* 2002 WL 109272, at *4. While we agree with the result reached by the court of appeals, our analysis does not focus on the nuisance but rather on the nature of the underlying governmental activity that caused the nuisance. The application of vicarious official immunity to a nuisance claim is not automatic as Ramsey County argues, but rather is a policy question based on the facts presented. The determination of whether to grant immunity in each case depends on the kind of discretion which is exercised and whether or not the challenged government activities require something more than the performance of ministerial duties. If the activity is absolute, certain, and imperative, involving the execution of a specific duty arising from fixed and designated facts, it will be deemed ministerial, and official immunity will not be available. *Watson,* 553 N.W.2d at 414.

There are a number of duties at the operational level that the Slettens alleged caused this nuisance and resulting harm. We agree with the district court that the turning of the windrows on the site, the failure to follow composting guidelines published by the MPCA, and the allegations relating to water runoff are not min-isterial in nature and involve the exercise of discretion at the operational level. Accordingly, vicarious official immunity is applicable to those activities. However, there were allegations beyond these activities that for policy reasons cause us more concern.

█ The allegations that concern us relate to the volume of yard waste being deposited at the site and the required removal of grass clippings. We discuss the grass clippings first. In its analysis of the Slettens' negligence claim, the district court characterized the grass clippings as presenting the closest question as to whether Ramsey County's conduct should be protected by the doctrine of official immunity. This was in large part because of the 1994 and 1996 amendments to the CUP. Following those amendments, Ramsey County's CUP required it to remove grass clippings at least three times per week and prohibited it from composting grass at the site. These requirements were added to the CUP in response to neighbors' complaints and were designed to eliminate odor. It appears to be undisputed that the removal requirement in the CUP was not complied with on 36 separate occasions. Ramsey County concedes that this was in breach of the CUP requirements, but blames its contractor who "unilaterally decided to skip" certain days to haul grass clippings in violation of the CUP.

█ In deciding the negligence issue, the district court concluded Ramsey County should not lose official immunity due to 36 untimely grass clipping pickups, "particularly because no harm resulted from the conduct." The district court reasoned that "[p]roving harm related to slow grass pick up in the absence of odor complaints is unlikely." The district court did not utilize the same reasoning with regard

to the Slettens' nuisance claims, however, and made no mention of the CUP or the MPCA Permit–by–Rule. Rather, it concluded that "[n]egligence and nuisance claims should be treated differently in considering the applicability of official immunity." The district court pointed out that in nuisance actions the focus is on the problem created and in negligence the focus is on the offensive conduct. However, regardless of the number of complaints, grass removal, as specified in the CUP, is precisely the type of conduct that is ministerial in nature in an immunity analysis. In an official immunity analysis, notwithstanding the difference between negligence and nuisance, the focus is on the kind of discretion which is exercised for immunity to be available, something more than the performance of ministerial duties would be required. A further condition of the CUP was that Ramsey County was to continuously monitor this site at all times to prevent anaerobic fermentation. There were numerous serious claims of personal injury and property damage associated with this site from not only the odors but also the gram/negative bacteria and various pathogenic bioaerosols coming from this site.

The employees of this site were involved in the execution of a duty arising from fixed and designated facts. These rules, at a minimum, establish the ministerial nature of the duties of the staff operating the Maplewood site for Ramsey County. Therefore, we affirm the court of appeals and hold that the individual government employees are not entitled to official immunity and Ramsey County is not entitled to vicarious official immunity that would shield Ramsey County from suit.[12]

We have similar concerns related to the volume of the yard waste that was deposited at this site. This compost and later transfer site had the potential for significant environmental effects. Ramsey County concedes that permission from the MPCA was required to operate this yard waste compost facility.[13] Minnesota Rule 7035.2836, subp. 2 (2001), requires an owner or operator of such a facility to submit a notification form to the commissioner of the MPCA. This notification must include the facility location, the name, telephone number and address of the contact person, the facility design capacity, the type of yard waste to be received, and the intended distribution of the finished product. Minnesota Rule 7035.2836 (2001) has additional operation requirements for the yard waste compost facility. For example, subpart 3(G) requires the facility operator to submit an annual report to the commissioner that includes the type and quantity, by weight or volume, of yard waste received at the compost facility, the compost produced, and the weight or volume of compost removed from the facility. In obtaining a Permit–by–Rule to operate this facility, Ramsey County certified that it would compost grass and leaves and that the total facility design waste capacity at this site would be 9,000 cubic yards annually. This was based on MPCA standards and guidelines that call for approximately

---

**12.** Having said this, it is still important to remember that although not immune from suit, Ramsey County is not necessarily liable on the claims. At trial, the Slettens still have the burden of proof and there are major factual disputes as to causation and damages. Ramsey County introduced evidence that they complied with both "the MPCA Rules" and the CUP. That contention raises a factual dis-

pute relating to the ultimate issue of liability and that defense may be presented to the jury.

**13.** For example, Minn.Stat. § 116.081 (2002) makes it unlawful for any person to construct, install or operate any storage facility related to the collection, transportation, storage, or disposal of waste, or any part thereof, without having been granted a written permit.

one acre of land for each 3,000 to 3,500 cubic yards of waste collected. This Permit–by–Rule involves official governmental action approving the compost site project, which is wholly conducted, regulated, and approved by the MPCA. From 1990 through 1995, this facility is alleged to have received quantities vastly in excess of the facility's cubic yard design capacity. Even when cubic yards transferred from this site are considered, the facility design capacity was allegedly exceeded in every year but 1991.

Without deciding whether this MPCA Permit–by–Rule has the force of law, we conclude that ministerial duties are involved here. The facility location and the "facility design waste capacity" of 9,000 cubic yards per year are integral components of the facility's very existence and set out clear parameters for its operation. The City of Maplewood became concerned enough to have a requirement of continuous monitoring of this site. The MPCA rules require quantification of the yard waste being processed and removed. The operational activities of the individual employees of Ramsey County, in our opinion, left nothing to discretion with regard to the annual site capacity. Ramsey County, through Mr. Hanson, the supervisor of this site for Ramsey County, conceded that "[t]he Site was * * * regulated by the Minnesota Pollution Control Agency." We agree. Mr. Hanson also acknowledged MPCA rules as governing the activities of the staff at the site, but alleges these rules were complied with. The question of compliance can be determined at trial. For our purposes here, it is enough to say that these facility design limitations were not mere suggestions, but an integral part of the governing process, which allowed this facility to be established and operate at the specific location in question. Ramsey County is not entitled to the special status of a defendant immune from a lawsuit of this nature, which would allow it to escape all liability. Accordingly, as a matter of law, as the district court concluded, Ramsey County is not entitled to vicarious official immunity on the Slettens' nuisance claim. Refusing to extend official immunity to Ramsey County under these facts would not deter the county's compost workers' performance by focusing "stifling attention on performance," *Olson,* 509 N.W.2d at 372, but would rather encourage these employees to comply with governmental permits, operating requirements, and facility design limitations, which were sufficiently certain and imperative. We therefore affirm the court of appeals on the grounds stated herein and remand this case to the district court for trial.

## II.

The second issue before us is whether the district court erred in its method of evaluating the county's official immunity defense against the negligent failure to warn claim. As with the nuisance claim, the starting point for analysis of this immunity question is identification of the precise governmental conduct at issue. *Gleason,* 582 N.W.2d at 219. Again, official immunity applies when the official's conduct involves the exercise of judgment or discretion; it does not apply to ministerial duties. *Kari,* 582 N.W.2d at 923. A discretionary decision involves individual professional judgment that necessarily reflects the facts of a situation and the professional goal. *Wiederholt,* 581 N.W.2d at 315. In contrast, a ministerial duty is one in which nothing is left to discretion; it is "absolute, certain, and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Id.* (citation omitted).

To decide whether Ramsey County could claim official immunity, the district court applied *Cracraft v. City of St. Louis*

*Park,* 279 N.W.2d 801 (Minn.1979). However, *Cracraft* addressed an issue of substantive tort law. It involved a duty to inspect and established a test to determine if a government entity has a special duty of care rather than a general public duty to assure that third persons comply with the law. *Id.* at 806–07. In *Cracraft,* we cited to *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158 (1972), which recognized that the Minnesota legislature had abolished the doctrine of sovereign immunity as it applied to political subdivisions of the state and held that "these statutory provisions [abolishing immunity] merely removed the defense of immunity * * * and did not create any new liability for a municipality." *Hoffert,* 293 Minn. at 222, 199 N.W.2d at 159–60. In *Cracraft,* we mentioned that the applicable codes, ordinance, or statutes had not been drawn with sufficient specificity to create an inspection duty in favor of a class of individuals rather than the public as a whole. *Id.* at 806. We affirmed the grant of summary judgment because the record failed to show the creation of an assumed or special duty and reiterated that the abolition of sovereign immunity created no new torts. *Cracraft,* 279 N.W.2d at 808. So, while *Cracraft* may ultimately be utilized in this case, utilizing *Cracraft* before reaching the official immunity issue was an error. The question of whether a special duty to an individual exists differs from whether official immunity applies to the governmental conduct in issue, that is, whether the conduct at issue is discretionary or ministerial. If Ramsey County's agents were protected by official immunity, the district court would not reach duty of care, special duty, or foreseeability issues. *See Johnson v. State,* 553 N.W.2d at 50.

The court of appeals affirmed the district court's decision, but it did not utilize *Cracraft.* Rather, it held:

"[P]ublic officials clearly have a duty to adhere to ordinances and statutes." *Wiederholt,* 581 N.W.2d at 316. Here, we reject [Ramsey County's] argument that it had discretion to decide whether to warn of known dangers, especially in light of its concession that it owed such a duty.

*Sletten II,* 2002 WL 109272, at *7. In *Wiederholt,* the ordinance at issue required the immediate repair of "any sidewalk slab projecting more than one inch above the adjacent slab." 581 N.W.2d at 316. Discretion was unnecessary in determining if the criterion was met and in determining whether to repair the sidewalk. Here, Ramsey County acknowledged through Robert Fulton, Director of Public Health at the Ramsey County Division of Solid Waste, that it had a duty to warn of known dangers and had knowledge of the dangerous nature of the pathogens alleged to be at the compost site. We agree with the court of appeals in rejecting Ramsey County's argument that Ramsey County had discretion to decide to warn of known dangers in light of its concession that it owed such a duty. There is obviously a general duty in such circumstances, but that does not resolve the issue of official immunity before us.

█ In an official immunity analysis, the focus is on the precise governmental conduct. *Gleason,* 582 N.W.2d at 219. Official immunity operates to protect an individual employee's action on the operational level unless the employee's duty is ministerial. *Kari,* 582 N.W.2d at 923. The record before us is devoid of any facts, rules, regulations, permits, protocol or public policy that would define Ramsey County's obligation to warn of known dangers as ministerial. The compost site's employees did have some discretion as to when, how and who was warned. Based upon the facts presented to us, we conclude that the

public officials would be entitled to official immunity, and therefore Ramsey County is entitled to vicarious official immunity on the claim of negligent failure to warn.

Affirmed in part, reversed in part and remanded for trial to the district court.

PAGE, Justice (dissenting).

I respectfully dissent. While I agree with the court's holding that official immunity is applicable to nuisance and negligent failure-to-warn claims, our analysis should have ended there. The petition for review in this case raised two discrete issues: (1) "Is vicarious official immunity inapplicable, as a matter of law, to a claim for nuisance?" and (2) "Is vicarious official immunity inapplicable, as a matter of law, to a claim for negligent failure to warn of potential dangers from airborne molds and bacteria?" We granted the petition for review to answer those two limited questions. The court now reaches beyond the two issues accepted for review and concludes that official immunity is not available to a claim for nuisance in this case because genuine issues of material fact exist, precluding summary judgment, with respect to what can only be characterized as a fictional violation of the MPCA permit and Maplewood's conditional use permits (CUPs) under which the compost site operated, and minor violations of Maplewood's CUPs, which the district court found caused no harm, a finding that was not challenged on appeal. The court notes that, unlike the court of appeals, its analysis focuses "[not] on the nuisance but rather on the nature of the underlying governmental activity that caused the nuisance." Of course, the reason the court of appeals focused on the "nuisance" was because the issue in front of it was whether the official immunity defense was applicable to nuisance and negligent-failure-to-warn claims. The question of whether fact issues pre-

cluding summary judgment existed was not briefed or argued at the court of appeals or raised in the petition for review in this court. Finally, it should be noted that neither the complaint nor the amended complaint allege failure to comply with the Maplewood CUPs as a basis for liability under its nuisance theory.

I.

In going beyond the issues accepted for review, the court makes a number of serious errors. The first being that the court decides issues of fact and law that were not addressed below. This is clearly improper under our jurisprudence. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). In doing so, the court takes on the role of fact finder and makes findings that are not supported by the record before us.

Ignoring the record, the court relies on the factual statement from respondents' summary judgment memorandum at the district court, which it adopts almost verbatim. For example, with respect to the county's MPCA permit, the court finds that:

In the MPCA's "Permit–by–Rule Facility Notification Form," Ramsey County certified on May 23, 1990 that it would compost grass and leaves and that the total "facility design waste capacity at the site would be 9,000 cubic yards." * * * This capacity limit followed the MPCA mandate that "about one acre of land is needed for each 3,000 to 3,500 cubic yards of yard waste collected." Based on this certification, on July 5, 1990, the MPCA approved Ramsey County's application to compost a maximum of 9,000 cubic yards of grass and leaves on the Beam Avenue site. * * *

From 1990–1996, Ramsey County certified in required annual forms to the MPCA that the Beam Avenue site's yard waste capacity was 9,000 cubic yards.

The Slettens allege that Ramsey County significantly exceeded its represented and authorized design capacity. In 1993, for example, Ramsey County received 27,480 cubic yards of yard waste and transferred only 6,240 cubic yards, leaving 21,240 cubic yards to be managed on the site, or 12,240 cubic yards over the permitted amount for compost. The permit violations led to the alleged formation of anaerobic bacteria and other pathogenic bioaerosols, as well as odorous compounds such as ammonia and hydrogen sulfide. Ramsey County's compost expert, Dr. Elliot Epstein, stated in a 1997 book that ammonia is released from decomposing grass clippings and when anaerobic conditions occur, odorous sulfide compounds such as hydrogen sulfide are produced.

(Footnotes omitted.)

These alleged "facts" are inconsistent with the record before us.[1] It is clear from the record that there were no volume restrictions set by any of the Maplewood CUPs or the MPCA permit. Careful review of the record reveals that the figure of 9,000 cubic yards of "grass and leaves," which the court points to as a mandate, was derived from MPCA guidelines that, according to the affidavit of Rebecca Wirth, the MPCA Senior Pollution Control Specialist in charge of regulating yard waste sites in Minnesota, do not have the force of law. In her affidavit, Wirth describes the yard waste composting permit process that covered the site at issue here. With respect to the facts found by the court, paragraphs 4, 5, 6, 7, and 13 of Wirth's affidavit bear repeating:

4. I am very familiar with the yard waste and solid waste composting rules in effect in this state from 1990 through the present. I personally rewrote those rules in 1995. The rewritten rules became effective in September of 1996.

5. Permits for yard waste composting facilities are covered under Minnesota Rules Chapter 7001, part 7001.3050, entitled "Solid Waste Management Facility Permits." Attached hereto as Exhibit B is a true and correct copy of this rule. *Subpart 3 of part 7001.3050 provides that certain facilities, including compost facilities receiving yard waste only, will be entitled to a "permit-by-rule," that is, the owner or operator is deemed to have obtained a solid waste management facility permit without making application for it,* unless the commissioner of the Pollution Control Agency finds that the facility is not in compliance with the portions of the rules applicable to the facility. *Nothing in subpart 3(C) of the rule limits the amount of material that can be composted at a yard waste facility,* in contrast to other facilities covered by the permit-by-rule status. Yard waste composting facilities must comply with subparts 2 and 3 of part 7035.2836. Attached hereto as Exhibit C is a true and correct copy of Minn. R. 7035.2836. *Nothing in subparts 2 and 3 of part 7035.2836 limits the amount of yard waste that can be composted at a yard waste facility* (unlike some other facilities which are covered by part 7001.3050). *Accordingly, the permit-by-rule under which yard waste composting facilities, including the Maplewood site, operate do not limit the amount of material that the facilities can handle, as long as the requirements of the rule, such as periodic turning, are met. The notification form filled out by an owner*

---

1. At the risk of looking as though I am engaging in the same kind of fact-finding that I criticize the court for engaging in, I note that a detailed discussion of the facts is made necessary by the court's loose use of the record.

*or operator of a yard waste composting facility is not a permit and does not have the force of law. Nor is the MPCA's letter responding to the notification form a permit. The permit is the rule itself, which contains all of the requirements with which the owner or operator must comply.*

*6. I received and reviewed the annual reports filed by Ramsey County with respect to the Maplewood site. The amounts reported to be composted did not appear to be excessive for a 3–4 acre site.* My publication, *Introduction to Composting*, indicates that "(o)n the average, about one acre of land is needed for each 3,000 to 3,500 cubic yards of yard waste collected." *Id.* at II–1. As stated in the publication, however, *the amount of land required depends on a number of variables, including the composting method and type of equipment used. The amount of land needed also depends, obviously, on the amount of yard waste removed from the site and not composted there.* The annual reports from Ramsey County indicate that large quantities, presumably grass clippings, were removed from the site and not composted there.

*7. In 1994, I served on an Ad Hoc Technical Advisory Group organized by Ramsey County to evaluate its yard waste compost facility in Maplewood and to advise the County on issues regarding that site. I toured the Maplewood site on June 15, 1994.* The Technical Advisory Group found it to be a model yard waste site. *The quantity of leaves being composted at the site was by no means excessive, and there appeared to be ample room to turn the windrows.*

\* \* \* \*

*13. I am aware of no violation of the applicable state rules by Ramsey County in its operation of the Maplewood compost site. It was, as I previously stated, a model composting site.*

(Emphasis added.)

A fair reading of Wirth's affidavit can lead to only one conclusion. The Maplewood compost site was not limited to accepting 9,000 cubic yards of yard waste. Nor is there any other evidence in the record indicating that the county's authorization to operate the site hinged on an absolute limit of 9,000 cubic yards. Clearly, Minn. R. 7035.2836, subd. 2 (2001), does not, on its face, create such a limit. Further, given Wirth's affidavit, the May 23, 1990, Permit–by–Rule Facility Notification Form, and the July 5, 1990, letter from Rodney Massey, Director of the MPCA's Ground Water and Solid Waste Division, to Robert Fulton, the county's Director of Public Health at its Solid Waste Division, no such absolute limit can fairly be implied from the rule. Finally, no such limit is imposed either directly or indirectly by any of the Maplewood CUPs. *See* note 4, *infra.* Nevertheless, the court finds that the MPCA's approval was based on the submitted design capacity and that an absolute limit on yard waste volume was established at 9,000 cubic yards.[2] The court is simply wrong.

**2.** The court relies on the Maplewood CUPs' requirement of "continuous" monitoring to support its finding that a volume restriction existed. The court also claims that Ramsey County was to continuously monitor the site to prevent anaerobic fermentation. While the CUPs did require that a monitor be present when the site was open, there is nothing in the record identifying what was to be monitored. The court's finding that the monitor was to be monitoring the volume of the materials at the site and preventing anaerobic fermentation is nothing more than pure speculation. One could just as easily speculate that the monitor was there to ensure that garbage and trash were not being deposited at the site.

The court concludes that the " 'facility design capacity' of 9,000 cubic yards per year [is an] integral component[ ] of its very existence and set[s] out clear parameters for its operation." [3] In light of the record before us, including Wirth's affidavit, the rules regulating operation of the site, the Permit–By–Rule Facility Notification Form, the Maplewood CUPs, and the lack of any other evidence supporting its findings, the court is hard-pressed to arrive at that conclusion, a conclusion that is supported by no more than the court's will.

With respect to the violation of the Maplewood CUPs,[4] the trial court found and

3. As discussed above, that conclusion is unsupported by the record. There is even less support in the record for the assertion that the facility design capacity was 9,000 cubic yards "per year." Even if a 9,000 cubic yard limit on yard waste is assumed, it is likely that the limit was applied to the maximum amount of yard waste permitted at the site at any given time. There is nothing in the record to suggest otherwise, and there is nothing in the record to suggest Ramsey County was over the 9,000 cubic yard limit at any given time. Under the court's reading, if the site reached the asserted 9,000 cubic yard limit during the first half of the composting season, it could not accept any additional yard waste for the remainder of the season. Because no permit violations have been established, the court cannot properly conclude that permit violations led to the alleged formation of anaerobic bacteria, pathogenic bioaerosols, and odorous compounds.

Further, the court's reliance on Dr. Epstein's statements from his 1997 book is, to say the least, curious. Dr. Epstein's book simply describes the composting process. As the book notes, anaerobic conditions occur during the composting process when there is not enough oxygen available to maintain aerobic conditions. While anaerobic conditions do lead to an increased release of anaerobic bacteria, pathogenic bioaerosols, and odorous compounds, whether such conditions take place depends on how frequently the windrows are turned. Having held that the district court's conclusion that the county is entitled to vicarious official immunity with respect to the turning of the windrows at the site was not error, it is difficult to understand how the court now concludes that the act of managing anaerobic conditions is not entitled to immunity. Moreover, Dr. Epstein did not suggest and the record does not support a finding that the release of anaerobic bacteria, pathogenic bioaerosols, and odorous compounds was in any way related to, much less caused by, the alleged permit violations. Therefore, assuming there were permit violations, the permit violations did not lead to the release of anaerobic bacteria, pathogenic bioaerosols, or odorous compounds. Finally, the statements from Dr. Epstein's book relied on by the court only address the release of odorous compounds. As discussed below, the Slettens cannot sustain a claim based on odors.

4. The 1991 CUP was conditioned on the following requirements:

1. The site may be open to the public between March 24 and December 6 of each year.
2. The site may be open to the public between the hours of 9:00 a.m. and 8:00 p.m.
3. The County shall provide at least one monitor at the site for all hours that it is open to the public. If the city or County determines there is a need for more site monitoring, the County shall assure that the site has adequate monitoring.
4. The site shall accept only the following materials: garden waste, lawn cuttings, weeds, prunings of soft bodied plants, leaves along with materials like pine cones, fruit and small twigs that people pick up with their yard waste.
5. The City prohibits the dumping or storing of the following materials: wood chips, brush and branches, garbage or refuse [at] the site.
6. The County shall have the grass clippings removed from the site as often as necessary to prevent odors.
7. The City Council shall review this permit in 5 years.

The 1994 CUP included the same conditions as required by the 1991 CUP, but required that grass clippings be removed from the site at least three times a week. In addition, the CUP changed the periodic review of the permit from five years to annually. Further, the CUP required fulfillment of these additional terms:

8. The County shall manage the compost site to minimize the amount of objectionable

odors. Management procedures shall include the following:

a) Procure, maintain and use wind direction and speed monitoring equipment at the site. The County shall provide this equipment so it is accessible to the City staff.

b) Record wind speed and direction every two hours during pile turning and the haul-out of materials.

c) During April through October, turn the piles of materials only when the wind is blowing from the southeast, south or southwest and at least five miles per hour. During November through March, the wind must be calm or from the east, south or west. The piles shall only be turned between the hours of 8:00 a.m. and 4:00 p.m. on Monday through Friday.

d) Keep a written record of:

1) The times of pile turning and the haul-out of materials

2) Compost pile temperatures

3) A description of the compost quality

4) The initial date and aging of the compost piles

9. The Community Development Department shall handle odor complaints during regular business hours and the police department shall handle odor complaints after regular hours. The inspector shall verify and measure whether there is an odor that violates the odor standards of this permit. To determine if there is a violation of this permit, the inspector shall follow the procedures in Attachment A of this permit. A violation of this permit shall occur when the inspector has recorded ten sniffings of the ambient air over a period of thirty minutes with a geometric average OIRS of (a) 3.0 or greater if the property at which the testing is being conducted contains a permanent residence, or (b) 4.0 or greater if the property at which the testing is being conducted does not contain a permanent residence. (See Attachment B of this permit for a description of the odor scale.) If there is a violation, the inspector shall investigate to establish the source of the odor. The City shall notify the County of the violation. The County shall advise the City of the reason for the problem and correct it to meet the standards of this permit. The County or site operator shall cooperate with the City or its representative regarding such investigations.

10. The County shall deposit with the City an escrow deposit of $5,200 on or before May 1, 1994. Thereafter, on or before January 1 of each year the County shall deposit with the City an escrow deposit of $2,000. The City shall use this deposit to:

a) Pay for City staff time or the costs to hire a third party to verify and measure odors, following complaints received by the City

b) Train City staff persons and others for wind and odor monitoring

c) Pay for an odor consultant to assist in preparing this permit or future revisions to this permit.

At the end of each calendar year, the City shall refund to the County any of the deposit not used by the City. If needed, the County shall pay for any consulting costs above the escrow deposit that the City needs to reevaluate this permit.

11. The site operator shall use water to suppress dust from the compost piles, as necessary.

12. Phalen Chain-of-Lakes Watershed Steering Committee's technical staff shall review leeching of water issues and concerns on the site.

13. County shall monitor and remove noapproved items from the site.

14. County to report by August 1, 1994 on:

a) Reduction of size,

b) Explore alternate site location,

c) Prohibit use by commercial businesses,

d) Report update on aspergillus fumigatus from other districts and sites,

e) Update from Soil Conservation.

The 1996 CUP included most of the requirements from the 1991 and 1994 permit and included several requirements related to the closing of the site as a compost facility:

10. The County shall be allowed to complete the process of composting the leaves that were collected in the fall of 1995 and spring of 1996 and that are on the site as of October 1, 1996. This material will be considered finished in the spring of 1997.

11. Beginning with material received in the fall of 1996, the site shall operate as a transfer site. Leaves received during April–May and October–November [shall be] transferred from the site on a regular basis. Leaves may not be stored on site for a period of longer than three (3) weeks. In the event of weather conditions, such as a snowstorm in the fall that preclude haul-out of leaves within three (3) weeks, the Director of Community Development may grant permission to the [C]ounty to store leaves on the north part of the site until such time that the leaves may be hauled out. Under such circumstances, leaves

the record establishes that between 1995 and 1999 there were 427 scheduled pickups of grass clippings and that 36 of them were missed. That is, on 391 occasions, grass clippings were timely removed. The trial court also found that odor complaints received by the county and Maplewood during the years in which these grass clipping pickups were missed totaled three in 1995, one in 1996, none in either 1997 or 1998, and one in 1999. Thus, the trial court found that the missed pickups did not result in odor complaints. In dismissing the Slettens' negligence claim related to the grass clippings, the trial court reasoned:

The bottom line with regard to the hauling of grass clippings is this: should the County lose official immunity protection for its operational level activities at the compost site due to 36 untimely grass clipping pickups. I conclude that it should not lose official immunity on this basis particularly because no harm resulted from the conduct. Moreover, even if official immunity does not apply, the Plaintiffs have failed to make any case for negligence relating to the hauling of grass. There are no damages arising from this conduct. No *genuine* issue of *material* fact exists. Proving harm related to slow grass pick up in the absence of odor complaints is unlikely. Summary judgment is not to be avoided simply because there is some metaphysical doubt as to a factual issue.

(Citation omitted.)

Significantly, the trial court determined that,

even if official immunity does not apply, the plaintiffs have failed to make any case for negligence relating to the hauling of grass. *There are no damages arising from this conduct.* * * * *Proving harm related to slow grass pick up in the absence of odor complaints is unlikely.* Summary judgment is not to be avoided simply because there is some metaphysical doubt as to a factual issue.

(Emphasis added.) Thus, in evaluating respondents' negligence claim based on the same conduct, the trial court came to the unchallenged conclusion that in light of the lack of odor complaints the missed grass clipping pickups caused no provable harm and thus caused no damage. The trial court's findings and conclusions with respect to grass clippings were not appealed to the court of appeals and are not subject to challenge in this appeal. The trial court's findings with respect to the negli-

---

shall be removed from the site by April of the following year.

The County shall have the grass clippings removed from the site June–September at least three times a week or other days if necessary to help prevent objectionable odors.

12. The County shall place wood chips and finished compost on site for citizens to take.

13. The County is requested by the City to look for an alternate yard waste site in the northeast part of the County that would be used to reduce the traffic at the site on Beam Avenue.

14. The County shall make best efforts to develop a yard waste composting site on County property in the vicinity of the Workhouse, north of Lower Afton Road. The site would be up to 10 acres in size, and would not be open for residents to drop off material. The City will assist the County in obtaining permits for this site.

15. The southern part of the site on Beam Avenue shall not be used for yard waste management by the County after the spring of 1997.

16. Should the County be unsuccessful in siting and permitting a site in the vicinity of the Workhouse, then the City Council will review this permit and may allow the County to compost material on the northern portion of the site on Beam Avenue.

17. The County is granted permission to make improvements to the site, including: widening and paving the entrance road; installing a new, wider gate; installing four light posts and fixtures; and installing traffic control signs.

gence issue relating to the hauling of grass should doom respondents' nuisance claim related to that issue to the same fate as the negligence claim. Of equal importance is the fact that the focus in a nuisance claim is on the alleged harm. Here, absent odor complaints, there not only is no damage, there is no harm and therefore no supportable nuisance claim. Yet the court gives the grass clipping issue new life under the guise of the nuisance claim. Remand for trial on the grass clipping issue in the context of the Slettens' nuisance claim would seem to be a waste of judicial resources.

## II.

The court's handling of the grass clipping removal issue on the merits is equally troubling. The goal of official immunity is to protect public officials from personal liability that might deter independent action and impair effective performance of their duties. *Elwood v. Rice County,* 423 N.W.2d 671, 678 (Minn.1988). Official immunity applies when the official's conduct involves the exercise of judgment or discretion; it does not apply to ministerial duties. *Kari v. City of Maplewood,* 582 N.W.2d 921, 923 (Minn.1998). A discretionary decision involves individual professional judgment that necessarily reflects the facts of a situation and the professional goal. *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 315 (Minn.1998). A ministerial duty is one in which nothing is left to discretion; it is "absolute, certain, and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Id.* When entitlement to immunity is at issue, the focus of the inquiry must be on the precise conduct alleged to have caused the plaintiff's injury. *Kelly v. City of Minneapolis,* 598 N.W.2d 657, 667 (Minn.1999) (Gilbert, J., dissenting). As noted above, in this case, the county's failure to comply with the CUPs was not alleged as a basis for liability. Given the district court's finding based on uncontradicted evidence, which has gone unchallenged on appeal, that the missed grass clipping pickups did not generate odor complaints and caused no damage, it follows that the county's failure to comply with the CUPs cannot form the basis for denying official immunity. The court's decision is akin to the court holding that the ministerial sidewalk *"repair"* ordinance in *Wiederholt* precludes official immunity even when the conduct alleged to have caused injury was the negligent "failure to clear" debris from the sidewalk.

## III.

The court also points out that Ramsey County first raised the vicarious official immunity defense on remand from the court of appeals. The court then notes that the Slettens were not permitted to offer rebuttal evidence relating to "the ordinance and rule violations on capacity and expert testimony, arguing there was a per se violation of these limitations" in response to Ramsey County's vicarious official immunity claim. By doing so, the court suggests that precluding the Slettens from presenting this rebuttal evidence was unfair. It was not.

The court's discussion ignores two important facts. The first being that the complaint in this matter did not allege violations of the Maplewood CUPs. To the extent that the complaint alleged violations of the MPCA permit, it did not do so with any specificity. The need for rebuttal evidence apparently arose as a result of the county raising vicarious official immunity as a defense. The problem, of course, and the second fact the court ignores, is that immunity is a defense. A government defendant can only determine if it has any immunity defenses after the plaintiff has first identified the conduct and legal theo-

ries on which the defendant's liability is premised.

Here, the complaint did not identify the conduct or the legal theories the court now relies on. The county had to conduct extensive discovery to identify the precise conduct that created the claimed liability. It was only after pinning down the precise conduct during discovery that the county was in a position to determine available defenses. Evidently, the court believes that the general allegations of violations of statutes and rules included in respondents' amended complaint are enough to support respondents' reliance on alleged violations of the CUP and the MPCA permit. Yet, if respondents intended these general allegations to incorporate claims based on grass removal and volume restrictions, this intention should have been disclosed during discovery. But it wasn't. Because the immunity defense was raised in response to the complained-of conduct as identified during discovery, respondents were properly precluded from adding additional evidence with respect to conduct and legal theories not previously identified. Respondents' rights were not violated by the exclusion of additional evidence and new legal theories. Respondents' failure to identify alleged violations of the Maplewood CUPs and the MPCA permit as a basis for liability during discovery precludes any claim based on such violations now. To suggest that after the defendant identified a defense applicable to the complained-of conduct the plaintiff should be allowed to add new legal theories to avoid the defense stands normal litigation practice on its head.

### IV.

Finally, by addressing issues beyond those raised in the petition before the court, the court not only violates our jurisprudence, but also makes a mockery of the fair administration of justice and denies due process to Ramsey County. The issue of whether summary judgment is precluded by the existence of genuine issues of material fact with respect to the county's violation of rules and permits was neither raised nor briefed by either party. Nor does it appear from the record below that it was raised at the court of appeals. We have made clear that "an appellate court should consider only those issues that were presented and considered by the trial court." *In re Welfare of the Children of Coats*, 633 N.W.2d 505, 512 (Minn.2001) (citing *Thiele*, 425 N.W.2d at 582). Moreover, our jurisprudence requires that we limit our review to issues raised in the petition for review. *See Gordon v. Microsoft Corp.*, 645 N.W.2d 393, 397 (Minn. 2002) (limiting analysis to issue raised in petition); *Anderly v. City of Minneapolis*, 552 N.W.2d 236, 240 (Minn.1996) (declining to reach an issue that was not raised in the petition for review when a joint party seeking to raise the issue failed to file a petition). In keeping with this general rule, we have held that "it is proper for an appellate court to decide an issue not raised on appeal only when the reasoning relied upon by the appellate court is neither novel nor questionable. Needless to say, an appellate court should exercise this authority only sparingly." *State v. Glidden*, 455 N.W.2d 744, 746 (Minn.1990). We have also made clear that, in the absence of proper briefing, we will not address issues raised by the parties. *State Dep't of Labor & Indus. by the Special Comp. Fund v. Wintz Parcel Drivers, Inc.*, 558 N.W.2d 480, 480 (Minn.1997) (declining to reach an issue in the absence of adequate briefing).

Today, the court violates these principles without justification. Fairness requires that a party receive notice of and have the opportunity to address issues being decided on appeal. Here, the issue of

whether summary judgment in favor of Ramsey County is precluded by genuine issues of material fact with respect to the county's purported violations of rules and permits was not raised in the petition for review or briefed to either the court of appeals or this court, nor has Ramsey County ever had notice of or the opportunity to address that issue.

Therefore, I dissent.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice Page.

ANDERSON, RUSSELL A., J. (dissenting).

I join in the dissent of Justice Page.